ROBBINS GELLER RUDMAN
& DOWD LLP
SCOTT H. SAHAM (188355)
DARRYL J. ALVARADO (253213)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
scotts@rgrdlaw.com
dalvarado@rgrdlaw.com

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN (*pro hac vice*)
IRA A. SCHOCHET (*pro hac vice*)
ERIC J. BELFI (*pro hac vice*)
DAVID J. GOLDSMITH (*pro hac vice*)
MATTHEW J. HRUTKAY (297485)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jbernstein@labaton.com
ischochet@labaton.com
ebelfi@labaton.com
dgoldsmith@labaton.com
mhrutkay@labaton.com

*Attorneys for Lead Plaintiff Wahid Tadros and Co-Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAHID TADROS, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CELLADON CORPORATION, KRISZTINA M. ZSEBO and REBECQUE J. LABA,<br><br>Defendants. | Case No. 15-CV-01458-AJB (DHB)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge: Hon. Anthony J. Battaglia |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 4

III. PARTIES ..... 5

IV. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ..... 8

A. Heart Failure ..... 8

B. Celladon and Cardiovascular Gene Therapy ..... 9

C. Mydicar ..... 9

D. Process of New Drug Approval by the FDA ..... 10

E. CUPID 1, Stage 1 ..... 11

1. Design of CUPID 1, Stage 1 ..... 12

2. Reported Results of CUPID 1, Stage 1 Posit That Mydicar Is Safe ..... 12

F. CUPID 1, Stage 2 ..... 13

1. Design of CUPID 1, Stage 2 ..... 13

2. Reported Results of CUPID 1, Stage 2 Posit That Mydicar Is Effective ..... 15

G. Publication of CUPID 1, Stage 2 Results ..... 17

H. Publication of CUPID 1, Stage 2 Long-Term Results ..... 25

I. Mydicar Receives Fast Track Status, a Special Protocol Assessment, and Breakthrough Therapy Designation ..... 27

J. Design of CUPID 2 ..... 30

K. Celladon Raises $100 Million From Venture Capital Funds and the Capital Markets ..... 32

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..... 33

A. IPO Registration Statement ..... 33

B. 2013 Form 10-K and March 31, 2014 Conference Call ..... 36

C. April 10, 2014 Breakthrough Therapy Announcement ..... 39

D. May 13, 2014 Conference Call ..... 39

E. Jefferies 2014 Global Healthcare Conference ..... 40

F. August 7, 2014 Press Release and Conference Call ..... 43

G. Secondary Stock Offering ..... 44

H. Late 2014 Analyst Reports Confirm Materiality of Statements Touting Mydicar's Efficacy Based on CUPID 1 ..... 46

I. Best of *Circulation* Research Symposium ..... 47

J. Early 2015 Analyst Reports and Commentary Confirm That Unreliable CUPID 1 Results Led Market to Believe That CUPID 2 Would Be Successful ..... 49

K. 2014 Form 10-K ..... 50

L. In Eager Anticipation of CUPID 2 Results, Analysts and Commentators Predict Positive Outcome Based on CUPID 1 Data ..... 52

VI. THE TRUTH BEGINS TO EMERGE ..... 53

VII. POST-CLASS PERIOD EVENTS ..... 58

VIII. ADDITIONAL INDICIA OF SCIENTER ..... 58

A. Nature of Flawed CUPID 1 Trial ..... 59

B. Mydicar Was Celladon's Only Viable Product Candidate ..... 60

C. Celladon Was a Small Company and the Individual Defendants Were Closely Involved in Mydicar and the CUPID Trials ..... 61

D. Defendant Zsebo Was Fired Because of the CUPID 2 Disaster ..... 62

E. Insider Stock Sales ..... 63

F. Sarbanes-Oxley Act Certifications ..... 66

G. Corporate Scienter ..... 67

IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........ 67

X. LOSS CAUSATION ........ 68

XI. CONTROLLING PERSON ALLEGATIONS ........ 70

XII. CLASS ACTION ALLEGATIONS ........ 71

XIII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ........ 73

XIV. CAUSES OF ACTION ........ 75

COUNT I
Asserted Against Defendant Celladon for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder ........ 75

COUNT II
Asserted Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder ........ 79

COUNT III
Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934 ........ 83

XV. PRAYER FOR RELIEF ........ 85

XVI. JURY DEMAND ........ 85

Court-appointed Lead Plaintiff Wahid Tadros ("Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by and through his undersigned counsel, for his Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws asserting claims against Celladon Corporation ("Celladon") and the Individual Defendants named below, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

Lead Plaintiff's information and belief concerning matters other than himself and his own acts is based upon the investigation of his counsel, which included a review of reports filed by Celladon with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Celladon and the Individual Defendants; securities analysts' reports about Celladon; media and news reports related to Celladon; data and other information concerning Celladon securities; other publicly available information concerning the Company and the Individual Defendants; public information and data concerning MYDICAR® ("Mydicar"), Celladon's failed product candidate; information published by the U.S. Food and Drug Administration ("FDA"); and discussions with consulting experts. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this securities class action on behalf of himself and all persons and entities that, between January 30, 2014 and June 25, 2015, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock or call options of Celladon, or sold Celladon put options, and were damaged thereby (the "Class").

2. This action concerns a start-up biotech firm's efforts to push its sole product candidate, a novel gene therapy aimed at treating heart failure, through a

series of human clinical trials referred to by the Company as CUPID 1 and CUPID 2. The results of the CUPID 1 trial were posited by Celladon to show that Mydicar was safe and effective according to the endpoints of the study, and enabled the Company to advance Mydicar to CUPID 2, with top-line results to be announced in April 2015.

3. CUPID 1 had serious and fundamental shortcomings, however. For example, the patients in the high-dose treatment group, by nearly every measure and to a statistically significant degree, were objectively healthier at baseline than the patients in the placebo group. The fact that the patients receiving high-dose Mydicar were healthier at the outset influenced the results showing Mydicar to be effective compared to placebo. Although the CUPID 1 investigators, who included Celladon's CEO, conducted post-hoc "sensitivity analyses" that reassured the public that the patient baseline imbalances did not cause the reported positive results, these analyses, unbeknownst to the investing public, were arbitrary and biased and did nothing to correct the pervasive flaws of the study or otherwise reliably demonstrate statistically significant treatment benefit at any dose level.

4. Moreover, CUPID 1's multitude of domains and endpoints, combined with an unconventionally loose threshold for statistical significance as well as the other design and execution defects alleged below, virtually assured that Celladon would be able to claim success and tout Mydicar's safety and effectiveness in the absence of a true effect, yielding false positives. Indeed, each and every one of the numerous statistical or data defects, rather than being randomized in terms of their individual effects, suspiciously tilted toward yielding false positives. However, none of the defects, which in the aggregate rendered the study of no use in assessing the potential efficacy of Mydicar in the CUPID 2 trial, was apparent to a reasonable investor.

5. Before and during the Class Period, Defendants repeatedly and consistently lauded the misleadingly positive data points of CUPID 1, without qualification as to their limitations and flaws, and inescapably conveying the impression that CUPID 2 would yield equally positive results and thus enormous upside for Celladon shareholders.

6. Defendants had a strong motive for engaging in this deception. Simply re-conducting CUPID 1 with a better study design and patient population was not an option, given the enormous time and money that would be required for such an undertaking, the lack of financial resources to fund another CUPID 1 study, and the fear that the delay involved would advantage competitors. Defendants' positive Class Period statements regarding Mydicar in fact were not based upon empirical evidence.

7. Defendants' statements regarding CUPID 1 had the intended effect of attracting the attention of private investors in venture capital funding rounds in 2012 that raised $53 million, and of public investors in a January 2014 initial public offering ("IPO") that raised more than $50 million.

8. With the Company flying high, its stock price rose substantially during the first quarter of 2015, driven by investors' keen interest in CUPID 2's outcome and the view that the trial was bound to succeed given CUPID 1's facially impressive results. Analyst coverage reflected Defendants' deception, as sector analysts eagerly anticipated the CUPID 2 results and based their evaluation of Celladon's future value on the false impression Defendants had created.

9. In reality, the pervasive flaws in the CUPID 1 trial meant that its results provided no guidance as to whether CUPID 2 in particular would succeed. CUPID 2 was a massive gamble that Defendants were wagering with the Class's money—a material risk that Defendants concealed from the public.

10. The undisclosed risks to the Class began to materialize in and around April 26, 2015 when Celladon, after years of patient enrollment and study,

unblinded the CUPID 2 data and announced the results. CUPID 2 was a total failure, showing no treatment effect for high-dose Mydicar over placebo for any determined point of success. The market was shocked by the reversal given Celladon's many assurances about the "success" of CUPID 1, and Celladon's stock price plummeted ***80%***. The Individual Defendants, however, had carefully hedged their bets, preserving a substantial portion of their personal wealth created by the artificial inflation in Celladon's stock price by exercising options and selling shares ahead of the long-planned announcement.

11. Celladon continued to circle the drain, firing its veteran CEO, laying off most of its employees, and actively seeking a merger partner in order to avoid liquidation. Finally, on June 26, 2015, the Company announced it would abandon the Mydicar program and its other pre-clinical programs entirely. Celladon stock fell another ***38%***.

12. After the Class Period, Eiger BioPharmaceuticals, Inc. agreed to acquire Celladon conditioned on the resignations of all of the Company's remaining officers and directors, and the elimination of the Celladon name. The reverse merger is expected to close during the first half of 2016.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The Company maintains its principal place of business in this District, and did so throughout the Class Period, and many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in or were issued from this District.

17. In connection with the acts alleged in this Complaint, Celladon and the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

18. Lead Plaintiff Wahid Tadros purchased shares of Celladon common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated December 9, 2015, the Court appointed Mr. Tadros as the Lead Plaintiff in this action.

19. Defendant Celladon Corporation was founded in California in December 2000 and describes itself in its most recent Annual Report as "a clinical-stage biotechnology company with industry-leading expertise in the development of cardiovascular gene therapy." Celladon is a Delaware corporation that since June 30, 2014 has maintained its principal executive offices at 11988 El Camino Real, Suite 650, San Diego, California 92130. Prior to that date, Celladon maintained its principal executive offices at 12760 High Bluff Drive, Suite 240, San Diego, California 92130. At all relevant times, Celladon's common stock traded under the ticker symbol "CLDN" on the NASDAQ Stock Market ("NASDAQ"), which is an efficient market.

20. Defendant Krisztina M. Zsebo ("Zsebo") was the Chief Executive Officer ("CEO") of Celladon and a member of its Board of Directors from 2004 until June 1, 2015, when she resigned these positions and left the Company. Zsebo also served as President of Celladon from 2004 until June 2014. Throughout her tenure as CEO, Zsebo was an Executive Officer of the Company.

21. From March 2004 until October 2007, Defendant Zsebo was a partner at Enterprise Partners Venture Capital, a venture capital firm. Prior to joining Enterprise Partners, Zsebo held executive positions at Remedyne Corporation, a biotechnology company, Connetics Corporation, a specialty pharmaceutical company, ALZA Corporation, a pharmaceutical and medical systems company, Cell Genesys, Inc., a biotechnology company, and Amgen Inc., a biotechnology company. Zsebo received a B.S. in Biochemistry from the University of Maryland, an M.S. in Biochemistry and Biophysics from Oregon State University, and a Ph.D. in Comparative Biochemistry from the University of California, Berkeley. According to the Company's Proxy Statement filed with the SEC on April 30, 2015, Zsebo boasts "30 years of experience in the pharmaceutical industry" as well as "experience with drug development."

22. Defendant Rebecque J. Laba ("Laba") was Celladon's Vice President for Finance and Administration ("VP, Finance and Administration") for Celladon from 2007 through the end of the Class Period. Throughout her tenure as VP, Finance and Administration, Laba was an Executive Officer of the Company. Laba served as a consultant on finance and administration matters for the Company from 2005 through 2007, prior to her employment as VP, Finance and Administration. From 1999 to 2005, Laba served in various financial and operational roles at Idun Pharmaceuticals, Inc., until Idun was acquired by Pfizer.

23. Defendants Zsebo and Laba are referred to together herein as the "Individual Defendants." Defendant Celladon and the Individual Defendants are referred to together herein as "Defendants."

24. Each of the Individual Defendants, by virtue of her high-level position with Celladon, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during her tenure with the Company, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals. Each of these individuals, during her tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware but recklessly disregarded that these statements were being issued regarding the Company.

25. As executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on NASDAQ, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period.

26. The Individual Defendants, because of the positions of control and authority as executive officers of Celladon, were able to and did control the content of the SEC filings, press releases, and other public statements issued with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected.

Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

27. The Individual Defendants, because of their positions of control and authority as executive officers of Celladon, had access to the adverse undisclosed information about Celladon's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Celladon officers and employees, attendance at Celladon management meetings, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Celladon materially false and misleading when made.

28. The Individual Defendants are liable as participants in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Celladon securities by disseminating materially false and misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Celladon's products, business, operations, and management, and the intrinsic value of Celladon common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire Celladon securities at artificially inflated prices.

## IV. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A. Heart Failure

29. Heart failure is a chronic and often devastating medical condition in which the heart is unable to pump blood throughout the body properly, depriving organs and other tissues of oxygen. In 2015, the American Heart Association ("AHA") estimated that there are nearly 6 million patients who have been diagnosed with heart failure in the United States. It is estimated that one in five adults at age 40 will develop heart failure during their remaining lifetime, and that approximately 250,000 to 500,000 patients in the United States are in the terminal

phase of heart failure and have symptoms that cannot be effectively managed by existing optimized medical therapy.

30. Accordingly, heart failure presented a significant business opportunity for Celladon, a biotech company that worked on developing gene-based therapies for cardiovascular diseases. Prior to and during the Class Period, Celladon repeatedly highlighted the severity of heart failure as a public health issue to show that its primary product candidate, Mydicar, had the potential of a huge target market in critically ill patients. As Celladon stated in its Form 10-K Annual Report for 2014, filed with the SEC on March 31, 2015 (the "2014 Form 10-K") and other SEC filings, as alleged below, the Company "estimate[d] that there were over 350,000 systolic heart failure patients in the United States alone who [would] be eligible for MYDICAR treatment upon launch."

### B. Celladon and Cardiovascular Gene Therapy

31. Gene therapy is the therapeutic delivery of genetic materials into a patient's cells for the purpose of treating disease. Such therapies are intended to replace a section of a patient's gene sequence in an attempt to correct for the root cause of the disease. The goal is to reprogram the diseased cells to perform at a normal, healthy level.

32. Celladon's R&D focused principally on the use of gene therapy to correct low levels of SERCA2a (sarco/endoplasmic reticulum $Ca^{2+}$-ATPase), an enzyme that becomes deficient in patients with heart failure. SERCA enzymes play an integral role in the regulation of calcium in all human cells. Calcium, in turn, plays an essential role in the ability of heart muscle cells to contract and relax, and thus in the heart's ability to pump blood effectively. Patients with heart failure are typically SERCA2a deficient.

### C. Mydicar

33. Mydicar, the Company's only advanced product candidate, was intended to be a one-time treatment that would replace portions of the genetic

material that regulates the production of SERCA2a. Heart cells receiving the corrective genetic material would produce more SERCA2a, leading to long-term increased calcium uptake. Increased calcium levels would improve the heart's ability to contract and relax, resulting in improved functionality. Because there was (and is) no FDA-approved heart failure treatment that offered the promise of long-term improvement, Mydicar received widespread attention as a potentially groundbreaking therapy.

34. For a gene therapy to work, the corrective genetic material needs a delivery mechanism, or "vector," to carry it into the patient's cells. Mydicar used a viral vector (specifically, adeno-associated virus 1, or "AAV1") to deliver its gene therapy into targeted cells, encapsulating the corrective genetic material in a shell made of harmless viral protein that heart cells are known to absorb. Once the viral vector delivers the corrective genetic sequence to the host cells, the DNA becomes a permanent part of the host cells' DNA. Mydicar was delivered using a cardiac catheter system called a coronary artery infusion, whereby a catheter is inserted into the femoral artery in the thigh and directed to the heart.

**D. Process of New Drug Approval by the FDA**

35. Companies seeking to develop medical treatments must obtain regulatory approval from the FDA. Product candidates are generally required to undergo three phases of clinical trials. Prior to engaging in clinical trials on humans, an Investigational New Drug ("IND") application must be submitted and approved.

36. A Phase I clinical trial generally tests the product candidate on a small sample of patients in order to determine any safety problems, determine dose tolerance, and any possible adverse side effects of the treatment. A Phase II clinical trial investigates safety and efficacy on a slightly larger scale, generally comparing patients receiving treatment (sometimes at various dosing levels) with patients receiving a placebo. Phase III clinical trials typically involve a larger test

population with broader geographic scope to further test the drug's efficacy and to determine whether the drug yields statistically significant results compared to a placebo or standard of care.

37. Unlike the protocols for Phases I and II, the clinical trial protocol for Phase III testing must be approved by the FDA prior to commencement of the study. A company whose product candidate successfully navigates Phase III may seek final FDA approval to market the drug to the public. The FDA also maintains certain expedited programs, including the Fast Track and Breakthrough Therapy designations and the Special Protocol Assessment ("SPA"), that accelerate the application and approval process and allow the sponsor to bypass various steps and procedures under certain circumstances.

38. If Phase III testing demonstrates efficacy, the sponsor submits a New Drug Application ("NDA") or, in the instance of a gene therapy or other biologic, a Biologics License Application ("BLA").

39. Each Phase is tested against its clinical endpoints, pre-specified scientific hypotheses that would establish success, be it with respect to safety, as in Phase I testing, or demonstrating treatment efficacy in Phases II and III testing. Meeting these endpoints is critical to showing positive outcome from treatment, and ultimately to obtaining FDA approval.

**E. CUPID 1, Stage 1**

40. In December 2006, Celladon filed an IND in support of clinical development of Mydicar. Celladon intended to produce Mydicar for commercial use worldwide, but initially planned on seeking approval for commercial use in the U.S. and the European Union ("EU"). Celladon thus needed to design and implement its clinical trials of Mydicar to meet the standards of the FDA and the EU's European Medicines Agency ("EMA").

### 1. Design of CUPID 1, Stage 1

41. In June 2008, the *Journal of Cardiac Failure* published "Design of a Phase 1/2 Trial of Intracoronary Administration of AAV1/SERCA2a in Patients with Heart Failure," co-authored by Defendant Zsebo. The study was called Calcium Up-Regulation by Percutaneous Administration of Gene Therapy in Cardiac Disease, or CUPID 1.

42. Although described as a Phase I trial, CUPID 1 was comprised of Stage 1 (safety) and Stage 2 (preliminary indication of clinical treatment effect), corresponding to the Phase I and II testing described above. In Stage 1, researchers tested the safety of Mydicar at various dosing levels, and did so by administering four sequentially escalating doses of the product to 12 patients. Test subjects were monitored for any "clinically meaningful" immune response to the AAV1 protein.

43. The primary endpoint for Stage 1, safety, was measured by the quantity and severity of "adverse events," including death from any cause or progression of heart failure leading to hospitalization. The first patient in Stage 1 was dosed on May 17, 2007.

### 2. Reported Results of CUPID 1, Stage 1 Posit That Mydicar Is Safe

44. On November 9, 2008, Celladon issued a press release announcing the initial safety findings for the first nine patients that received Mydicar in Stage 1 of CUPID 1. Data for the final three patients in Stage 1 testing – those receiving the highest dose of Mydicar – were not included in the analyses that formed the basis for this announcement.

45. The press release stated that the study had "show[n] the product was safe and demonstrate[ed] improvement across a number of key parameters," and quoted Defendant Zsebo as stating that the "data demonstrate the safety of

Mydicar, and the improvements in cardiac function and overall condition observed in some patients further validate our target and approach."

46. Celladon had no basis to make such positive statements, given that there had only been an analysis of data from nine patients, and the study was only intended to test for safety and dose tolerance, not treatment effect. Even at this early stage, when it was impossible (with incomplete data for so few subjects) for Defendants to determine whether Mydicar had caused any measure in heart failure patients to improve, Defendants were misleading the public about Mydicar and its prospects.

### F. CUPID 1, Stage 2

#### 1. Design of CUPID 1, Stage 2

47. Stage 2 of CUPID 1 was a Phase IIa efficacy trial that compared the use of Mydicar at 3 dose levels with placebo. Celladon announced that enrollment in Stage 2 was complete on August 31, 2009. The trial design provided that 24 subjects would be randomized to 1 of 3 doses of Mydicar groups of 8 each and 9 subjects would be randomized to placebo.

48. Stage 2 used a complex set of clinical endpoints by which efficacy was supposed to be measured. The study would be deemed demonstrative of clinical effect if, at the group level, the group mean improved in 2 of the 4 following "domains" ($p<0.2$),[1] with accompanying "trends" (even if statistically insignificant) in the same direction in other domains:

- Left ventricular function and remodeling (measured by percentage of blood ejected from the left ventricle with each contraction ("LV Ejection Fraction" or "LVEF")

[1] P-value refers to the likelihood that results of a trial are solely the result of chance. Thus, where $p=0.2$, there is a 20% likelihood that the results were caused by chance alone. And, therefore, $p<0.2$ represents the test design for meeting statistical significance; that is, a positive result would be shown if there is less than a 20% likelihood that the results were caused by chance.

and the post-contraction volume of blood in the left ventricle ("LVESV" or "Left Ventricle End Systolic Volume"));

- Symptomatic (measured by classification into severity of heart failure pursuant to New York Heart Association ("NYHA Class") and quality-of-life questionnaire ("Minnesota Living with Heart Failure Questionnaire" or "MLHFQ"));
- Functional (distance walked in 6 minutes ("6-minute walk test"), and measurement of maximum amount of oxygen absorbed ("$VO_2$ Max")); and
- Biomarkers (measuring the presence of chemicals referred to as BNP and NT-proBNP, which are elevated in heart failure patients).

49. At the individual patient level, for each specific endpoint, patients were graded as "improved," "worse," or "no change." More precisely, improvement on any one endpoint (*e.g.*, $VO_2$max) without worsening in any other endpoints ($p<0.2$) (and an overall trend in the same direction in other measures) would be indicative of treatment effect.

50. Finally, the study also had a clinical outcome endpoint that evaluated time from treatment to either death or heart-failure related hospitalization. The study was deemed demonstrative of efficacy if there was a statistically significant improvement ($p<0.2$) in time to death or heart failure-related hospitalization, with at least some numerical superiority (even if statistically insignificant) in other analyses.

51. This trial design, however, unbeknownst to a reasonable investor, is counter to basic principles of well-designed cardiovascular trials (even at Phase II), according to which:

> Each clinical trial should have only 1 primary end point, which should be defined before initiating the study. ***Use of multiple primary end points in a clinical trial is often a sign that investigators have let their biases influence the results they wish to report to the medical community*** . . . . Regulatory authorities and most journals insist on the a priori identification of a single end point, which thus insures the objective reporting of the study's findings.[2]

K. Stanley, *Statistical Primer for Cardiovascular Research: Design of Randomized Clinical Trials*, 2007 Circulation 115, 1166-69.

52. As Dr. Stanley further notes, use of multiple endpoints in cardiovascular clinical trials tends to demonstrate investigator bias in favor of a finding of efficacy. Likewise, the use of a p-value threshold of 0.2 throughout each of the Stage 2 analyses, representing up to a 20% likelihood of statistically significant results by chance alone (as to each individual endpoint) is highly unusual, because "[f]or [Randomized Clinical Trials], traditionally the [p-value] is set to 0.05," representing a much lower 5% likelihood of results caused solely by chance. *Id.*

53. Thus, diverging from the principles of well-designed clinical trials increases the likelihood of false positive results, which tendency is exacerbated when the p-values are as liberal as the 0.2 values used. The implementation of such a liberal p-value across each of 9 different endpoints over 5 different "domains" resulted in the deck being stacked in favor of a false finding of efficacy before the first piece of data was even collected.

**2. Reported Results of CUPID 1, Stage 2 Posit That Mydicar Is Effective**

54. On April 28, 2010, Celladon issued a press release announcing that the primary endpoint for Stage 2 of CUPID 1 had been met. Defendant Zsebo stated in the press release that:

[2] All emphases in quotations herein are added unless otherwise noted.

> ***[t]he results of the study clearly indicate[d] favorable treatment effects in this severely affected patient population***, and the potential benefits of Mydicar to patients with this disease [were] very encouraging.

She neglected to mention that the design of the trial virtually guaranteed success by some measure, and ran against principles of well-designed clinical trials; that the particular measurement of success chosen for the trial was one that was indicative of investigator bias; and ultimately that the results of Stage 2 testing were not truly indicative of a statistically significant treatment effect.

55. Further, as would later be disclosed, but was known to Zsebo at the time, there were significant imbalances in the patient baseline characteristics between the placebo group and the high-dose Mydicar group – the ***only*** treatment group to show a purported effect – rendering the high-dose group objectively healthier than placebo by nearly every measure from the outset of Stage 2 testing.

56. On November 15, 2010, Celladon issued a press release announcing the CUPID 1, Stage 2 long-term results, presenting the full 12 months of trial data. The Company stated that Stage 2, which studied 39 patients (as opposed to the 33-34 originally intended), met primary safety and efficacy endpoints after 6 months for high-dose Mydicar compared with placebo, and went on to note that:

> patients treated with the highest dose had an ***88 percent risk reduction*** . . . of major cardiovascular events such as: Death; Need for [LVAD] or cardiac transplant; Episodes of worsening heart failure; . . . [and] Number of heart failure related hospitalizations.

The Company also noted that:

> the 12-month CUPID data show that ***heart failure, which is a progressive disease, became stabilized in high dose MYDICAR treated patients***: heart failure symptoms, exercise tolerance, serum biomarkers and cardiac function ***essentially*** improved or remained the same while these parameters deteriorated substantially in patients treated with placebo and concurrent optimal drug and device therapy.

57. Given the flaws in the clinical trial design, and the imbalanced baseline characteristics which would later be disclosed, as alleged in ¶¶ 48-53,

64-70 above, the positive statements touting the purported treatment effects of high-dose Mydicar, including an 88 percent risk reduction, and the stabilization of heart failure, were misleading.

### G. Publication of CUPID 1, Stage 2 Results

58. "Calcium Upregulation by Percutaneous Administration of Gene Therapy in Cardiac Disease (CUPID): A Phase 2 Trial of Intracoronary Gene Therapy of Sarcoplasmic Reticulum $Ca^{2+}$-ATPase in Patients with Advanced Heart Failure" (hereinafter *CUPID 1 Results*) was published in the journal *Circulation* on July 19, 2011. The article, which was co-authored by Defendant Zsebo, stated that:

> [a]lthough there was improvement (defined as at least numeric superiority) in some parameters in the low- and mid-dose groups, only the high-dose AAV1/SERCA2a group ***met all of the primary end point success criteria for the 6-month primary analysis***.

59. In addition to the fact that Celladon provided the funding for the CUPID 1 study, at least six of Zsebo's nine co-authors had substantial relationships with the Company. For example, Dr. Donna Mancini was a consultant to the Company and was on its advisory board; Dr. Alex Yaroshinsky was also a consultant for and had an ownership interest in Celladon; Dr. Howard Dittrich was a consultant for, on the advisory board, and also had an ownership interest in the Company; Dr. Barry Greenberg was a consultant for the Company; and Dr. Roger J. Hajjar was the co-founder of and held an ownership interest in Celladon.

60. The article cited the following statistics, among others:

- "Patients on placebo consistently deteriorated over a 6- to 12-month period, whereas ***patients on the high-dose regimen either stabilized or improved***";
- "An additional predefined analysis [was] time to multiple clinical events over time"; and

- "Cardiovascular events in AAV1/SERCA2a-treated patients were either delayed or had a substantially reduced frequency or both."

61. The *CUPID 1 Results* also noted that risk of recurrent events (which was not a pre-determined clinical endpoint) was reduced by 60% in the low-dose group, 56% in the mid-dose group, and 88% in the high-dose group, when compared with the number of recurrent events observed in the placebo group.

62. The *CUPID 1 Results* also discussed a "permutation test," stating in conclusory fashion that:

> On the basis of a permutation test, the probability of achieving success on the bases of the predefined requirements for all of the study primary end point success criteria by chance alone was 2.7%. However, the study results exceeded the predefined primary end point success criteria. On the basis of the actual study results, ***the probability of achieving the observed results for the high-dose group versus the placebo group by chance alone was <0.1%***.

63. This purported observation, an effort to reassure the reader as to the reliability of the trial's statistical analyses, meant that although it was only 2.7% likely that the trial would meet one endpoint by chance alone, the likelihood that they would have found the ***same results actually found in CUPID 1*** was less than 0.1% (1 out of 1,000). However, the statement vastly glosses over the substance of what types of confirmatory tests were performed, and provides no indication as to how the authors confirmed the trial's purported outcomes at such an extreme level of statistical confidence. The online-only "Data Supplement" to the *CUPID 1 Results* provides no additional clarity as to how the "permutation tests" were performed or how they demonstrate the likelihood of outcome by chance in this trial.

64. *CUPID 1 Results* also notes, in an understated fashion, the presence of significant imbalances in the baseline statistics between the placebo group and the high-dose group (the only group that appeared to be responsive to Mydicar

treatment), demonstrating that at the outset of the Stage 2 CUPID 1 trial, high-dose Mydicar patients were objectively healthier by nearly every measure. (Specifically, the high-dose group was healthier than the placebo group for 7 out of 8 efficacy factors analyzed, and the other factor, NYHA Class, was the same for all trial subjects.) The article notes "some baseline differences for the placebo versus high-dose groups for important parameters such as $VO_2$max and [LV Ejection Fraction]." This discrepancy necessarily undermines the efficacy comparison between the high-dose group and the placebo group, and raises the question of whether the results lauded by Defendants were caused by the high-dose of Mydicar or the fact that the placebo patients were much sicker than the high-dose patients at baseline.

65. Nonetheless, in an effort to reassure readers as to the reliability of the trial, Zsebo and her co-authors, including paid agents of Celladon, represented that they conducted "a number of sensitivity analyses . . . to test the potential impact of these imbalances on study results." Based on these analyses, the investigators reaffirmed the successful outcome of Stage 2 of CUPID 1, stating in conclusory fashion that the sensitivity analyses "demonstrated that the baseline imbalances cannot explain any of the concordant positive outcomes in favor of the high-dose regimen, including the time to recurrent events analysis."

66. The Data Supplement detailed the "Sensitivity Analysis" and how Zsebo and her co-authors attempted to correct for baseline imbalances across multiple variables: "Several post-hoc sensitivity analyses were conducted in which the four 'highest risk' placebo patients with the lowest $VO_2$max, highest creatinine levels and very high NT-proBNP were removed from the analysis." The data was then analyzed without these high-risk patients included.

67. There are significant flaws with these sensitivity analyses that purportedly confirmed the overall findings of treatment effectiveness, none of which were apparent to a reasonable investor. First, it appears that the four

"highest risk" patients were identified after their data had been unblinded, resulting in inherent bias – the investigators needed to evaluate their data to determine which patients to remove from the data analysis, and provided no justification for their selection methodology, one that was based on only three variables: lowest $VO_2$max, highest creatinine levels, and very high (but not necessarily the highest) NT-proBNP. There is no reason to believe that these (as opposed to other variables) rendered a patient more or less "high risk."[3]

68. Further, it is unclear why the investigators decided to remove four patients from the analysis (as opposed to three or five, for example). Notably, even with these four "highest risk" subjects removed from the analysis, the remaining placebo patients' baseline readings show that they remain at higher risk on average than the high-dose Mydicar patients.

69. The investigators, including Zsebo, claimed that the sensitivity analyses confirmed "the trends noted in the primary analyses." This statement is belied by the fact that once those four patients' data were removed, there are no statistically significant differences (even with a liberal p-value threshold of 0.2) for either outcome in the "functional domain." That is, the p-value associated with comparisons of results for the 6-minute walk test changes from 0.181 (statistically significant under an improperly liberal threshold) with all 14 placebo patients included to 0.22 (not statistically significant even at that threshold) when the 4 "highest risk" patients were removed. Thus, after the sensitivity analysis, the group outcome no longer met the primary endpoint: there was statistically significant improvement on only 1 efficacy domain (only the LV Functioning/

[3] In fact, two of the patients removed in the sensitivity analysis have MLHFQ scores lower (healthier) than the mean, and one of these two also had a left-ventricular end-systolic volume and Ejection Fraction that are numerically better than the study mean.

Remodeling domain exhibits a p-value <0.2), whereas improvement on 2 of those domains was necessary to meet the primary endpoint. Accordingly, success on the group level analysis depended critically on the inclusion of one or more of these 4 placebo patients whom the investigators believed to be the "highest risk." This highly unusual result of their confirmatory analyses should have made apparent to Defendants the flaws with their study design, data interpretation, and ad-hoc corrective analyses that favored a finding of treatment effect, in essence showing that this finding was in fact correlated to the problem they had identified in the design.

70. Despite these flaws (which would have been known to Zsebo in particular, as an investigator and author of the study), the purported "sensitivity analyses" provided an opportunity to present data that supported a successful outcome while also addressing head-on the readily apparent baseline imbalances. It also kept Celladon from the cost and delay of having to re-conduct a Phase IIa clinical trial, the only procedure that would have truly corrected for these errors. After all, Celladon's ultimate success depended on successful commercial production of Mydicar, and that success depended critically on proceeding as soon as possible to Phase IIb testing. Going back to the design stage for another Phase IIa study would entail a delay of at least several years, something that was not a viable option given a substantial number of competitors in the process of developing and testing similar gene therapy concepts. Additionally, these clinical trials are costly, approximately $5-10 million each, a significant expense for a company like Celladon that was entirely dependent on cash infusions from outside investors.

71. In determining whether the Mydicar treatment groups actually saw improvement in CUPID 1 (*i.e.*, met their primary endpoints), the clinical investigators designed the study so that they would analyze data in group-level analyses, subject-level analyses, and the "Outcome end points; Time to Death (or

LVAD [implantation] or heart transplant) analysis was based on the Kaplan-Meier approach with AAV1/SERCA2a better than placebo (p<0.2)." Yet, the investigators later shifted in CUPID 2 to what they describe as an additional predefined analysis (which had not actually been predefined), time to multiple clinical events over time, or recurrent event analyses.

72. These recurrent event analyses, not discussed in the design of CUPID 1 or originally intended to be an endpoint demonstrating efficacy, were premised on the investigators' statistical methodology that allowed the counting of multiple related events for the same individual. Although not readily apparent to a layperson, the findings of differences in rate of recurrent events depend importantly on counting multiple events for the same patient as independent recurrent events (a protocol that substantially inflates the number of "events" attributable to the placebo group), particularly in estimation of the hazard ratio.[4]

73. For example, the study measured as independent "events" separate instances of worsening heart failure (without any clear definition of that phrase), even in patients who were clearly trending downward, and each of those independent "events" was related to the overall worsening of the patient's chronic condition. Thus, it is not clear that these events are actually independent "recurrent" events. One of the placebo patients, for example, experienced worsening heart failure at months 5, 6 and 7, making it highly unlikely that these events are truly distinct. The events at months 6 and 7 likely represent continued deterioration of the patient's existing heart failure, rather than two additional independent events. Yet these events, which are almost certainly related to each other, are counted for purposes of the CUPID 1 study as separate events for the

---

[4] The hazard ratio measures the comparative event rates between the treatment and placebo groups, and is inversely related to the "risk reduction" attributable to treatment. For example, when Celladon said that the hazard ratio between the high-dose Mydicar and placebo groups was 0.12, it represented an 88% reduction of risk of heart failure-related events.

placebo group; in the aggregate, this causes a disproportionate effect on the placebo group. For example, because the baseline imbalances resulted in a placebo population that was objectively less healthy than the high-dose group, the less-healthy placebo patients would have potentially increased risk of recurrent events than the high-dose group even in the absence of Mydicar treatment. Because the baseline imbalances would cause the placebo group to be at a potentially overall increased risk of recurrent events, the study's methodology of counting multiple events exacerbates the imbalances between placebo and high-dose group, as was ultimately observed, and falsely attributed to an effect of Mydicar treatment.

74. The lack of a response to increasing dosage amounts shows an additional flaw in the investigators' data analysis. The purported improvements Celladon celebrates are observed only when placebo patients are compared to the high-dose Mydicar group. For example, the mid-dose group exhibits no differences from the placebo group and, in fact has quality-of-life questionnaire scores worse than placebo at the end of the trial. The absence of an effect at the low- and mid-dose levels suggests, especially in the presence of so many other troubling data analyses and flaws in study design, that there is not a clear causal effect of treatment.

75. More troubling, and unaddressed by trial investigators, is the fact that by 12 months, one or both of the low- and mid-dose groups were actually performing numerically worse than the placebo group with respect to multiple measures, such as the 6-minute walk test, amount of oxygen absorbed into the body ($VO_2$max), NT-proBNP (a biomarker related to heart function), volume or blood remaining in the left ventricle after contraction, and the percentage of blood pumped out of the left ventricle.

76. Even more troubling is the fact that each of these methodological errors were not offsetting, with some making negative results more likely and

others increasing the likelihood of positive results. Rather, each of the flaws and biases identified herein lead in the direction of proving efficacy, an irrefutably better outcome for the Company, strongly supporting the inference that they were specifically designed for that purpose.

77. A review of the data and statistical analysis of CUPID 1 was undertaken by experts engaged by Lead Plaintiff, and are based on statistical principles that are apparent only to those well-versed in biostatistics. To come to a considered decision as to whether in good faith Defendants could have touted the CUPID 1 Stage 2 results as they did required them to identify each of the multiple flaws alleged above—any one of which seen in isolation may not be sufficient to affect one's judgment as to the reliability of the trial—and then consider the effect of all of them operating together. And even following such an analysis, significant questions remain as to the manner in which the authors and trial investigators executed their data analysis.

78. Accordingly, a reasonable investor could not have meaningfully identified the fact and extent to which data presented in *CUPID 1 Results* was fundamentally flawed, how those flaws rendered the study's data analysis insufficient and the study's conclusions statistically insignificant, or formed an unbiased belief whether the results of any subsequent, larger study would be comparable to the statistically unreliable results repeatedly touted by Defendants.

79. In contrast, Defendants, who were involved intimately in the trial design and implementation, who sponsored the clinical trials, and one of whom (Zsebo, the CEO) was an author of *CUPID 1 Results* and other Mydicar clinical trial literature, necessarily knew of and understood the flaws inherent in Stage 2 of the CUPID 1 study, all of which pushed the test results only in one direction, and indeed manipulated the design of the tests to reduce or eliminate the possibility of a negative outcome. Although the article identified some of these flaws, it glosses over them by vaguely describing the use of opaque permutation

tests and sensitivity analyses, which were unable, in any event, to correct the trial's fundamental flaws.

### H. Publication of CUPID 1, Stage 2 Long-Term Results

80. On September 26, 2013, Celladon announced the long-term follow-up results of Stage 2 of CUPID 1. Zsebo stated that "[t]he long term trends observed in the full three years of follow up from the CUPID 1 trial in the Mydicar high dose group are very encouraging," and noted that "[t]he duration of clinical response in the high dose group, coupled with the favorable trend in mortality and lack of safety concerns, leaves us optimistic for future development of Mydicar." When referring to the results as being very encouraging, she clearly meant encouraging for the outcome of the upcoming CUPID 2, Stage 2b trial.

81. The Company repeated its misleadingly impressive result, stating that:

> [t]he risk of pre-specified recurrent cardiovascular events through full three [sic]years of follow up was reduced by 82% in the high dose group compared to the placebo group (p = 0.048, where p-value is statistical probability of a result due to chance alone)."

82. Yet, in the presence of such significant and pervasive flaws in the study design and data analysis, and clear baseline imbalances on multiple parameters between the placebo and high-dose groups, data for a study population of only 39 could not be rescued by these post-hoc, biased sensitivity analyses. Importantly, it is unclear from the literature whether these same corrective analyses were even applied to interpretations of these long-term data.

83. Despite the significant flaws in the statistical analyses underlying the reported results of CUPID 1, as well as the baseline imbalances, the impact of which could never be corrected by the investigators' post-hoc, biased "sensitivity analyses," the Company continued to tout the remarkable results of that Phase 1/2a study. Celladon claimed clear benefits from the administration of high-dose

Mydicar: "the survival probability over time was higher for patients in ***all MYDICAR dose groups*** compared to the placebo group, especially in the high dose group."

84. Notwithstanding that recurrent events were not originally specified as endpoints in the CUPID 1 study (for either Stage 1 or Stage 2) in *Design of CUPID 1*, Celladon claimed post-hoc that the "***prespecified*** recurrent CV and terminal events in AAV1/SERCA2a-treated versus placebo patients were either delayed or had a substantially reduced frequency or both."[5]

85. Although Zsebo and her co-authors highlighted the fact that "patients in the placebo group had multiple CV events early during the follow-up after the infusion and continued experiencing these events throughout the ensuing 3 years," and that "[t]he high-dose group had relatively few CV and terminal events throughout the 3 years of follow up," they failed to note the substantial baseline imbalances between those two test groups that had been identified in the *CUPID 1 Results*, and that the sensitivity analyses conducted to consider the effect of these imbalances were methodologically arbitrary and baseless, or otherwise indicate whether those imbalances had in any way been factored into this long-term data analysis.

86. Regardless, the authors carried the earlier CUPID 1 Stage 2 findings into their long-term analysis without even mentioning the baseline imbalances that were expressly addressed in *CUPID 1 Results*:

> the findings in the previous publication of the 12-month active observation data have been extended to include the full 3 years of follow-up prespecified in the protocol. In the additional 2 years of long-term follow-up, the durability of reduced CV and terminal events in the high-dose cohort has been maintained.

---

[5] "Long-Term Effects of AAV1/SERCA2a GENE Transfer in Patients With Severe Heart Failure," CIRCULATION RESEARCH, Jan. 3, 2014 ("*Long Term Results*").

These statements collectively misrepresented and underplayed the risk that any subsequent Phase 2b trial would fail.

87. Given the actual results of CUPID 1, CUPID 2 was a roll of the dice, taking an undisclosed gamble with investors' money, because Defendants had neither the time nor money to return to square one and re-do the Phase IIa testing.

**I. Mydicar Receives Fast Track Status, a Special Protocol Assessment, and Breakthrough Therapy Designation**

88. Celladon announced on December 12, 2011 that the FDA's Center for Biologics Evaluation and Research ("CBER") had granted Mydicar "Fast Track" status based on the results of the CUPID 1 study. Fast Track is intended to expedite the review of drugs that treat a serious disease and fill an unmet medical need, or show some other significant advantage over other available treatments.

89. In seeking Fast Track designation for Mydicar, Celladon needed to provide only summary information to CBER. According to the FDA's May 2014 *Guidance for Industry: Expedited Programs for Serious Conditions—Drugs and Biologics* ("*FDA Guidance*"), which memorialized policies and procedures that CBER generally followed up to that point, a submission for Fast Track designation is to contain basic information that "in most cases . . . could be captured in approximately 10 to 20 pages." This information is to include, among other things, the basis for considering the drug to be one "intended to treat a serious condition" and "to have the potential to address an unmet medical need and an explanation of how this potential is being evaluated in the planned drug development program (e.g. a description of the trials intended to evaluate this potential)." The *FDA Guidance* explains that the potential to address an unmet medical need can be demonstrated by nonclinical or clinical data.

90. In a March 4, 2014 press release, the Company noted that it had received a Special Protocol Assessment ("SPA") in May 2012. Under the SPA,

the FDA had agreed that time-to-recurrent events in the presence of terminal events was an acceptable primary endpoint for any future Phase 3 trials. Accordingly, Celladon highlighted the fact that "[t]he CUPID 2 trial uses a similar clinical protocol with identical endpoints as agreed to in the SPA" for Phase 3 trials. The implication of this assertion was that if CUPID 2's Phase IIb results demonstrated efficacy (at least 45% reduction in hospitalizations) according to that same endpoint, the FDA may be willing to approve Mydicar based only on the CUPID 2 data.

91. Celladon also took the opportunity to announce another development, the receipt of advice from the EMA with respect to approval of Mydicar in Europe. According to the Company, "if MYDICAR demonstrate[d] a substantial and highly significant treatment effect in the advanced heart failure population [in CUPID 2], and no untoward effects," then it anticipated that "a phase 3 trial may not be required for marketing approval in Europe."

92. Similarly, Celladon advised prospective investors in its IPO Registration Statement that "[i]f the FDA [or the EMA] allows us to pursue an expedited approval process," which approval had already been obtained through the granting of Fast Track and Breakthrough Therapy status, the Company "anticipate[d] that [it would] seek registration for MYDICAR upon completion of our CUPID 2 trial and would not conduct the Phase 3 trial outlined in the SPA."

93. Yet, Celladon provided no guidance as to whether it intended to proceed to Phase III testing of Mydicar at all, leaving the only implication that the Company believed that the trial results from CUPID 2 would be sufficient to obtain approval from the FDA, the EMA, and other potential regulatory agencies. In any event, if Phase III trials were to eventually be required, Celladon would face immediate issues, given the fact that as of January 2014, they had an insufficient quantity of Mydicar drug substance and drug product to conduct a Phase 3 trial, and insufficient capital resources (even after the early 2014 IPO), to

begin Phase 3 testing. Defendants announced this fact in the same SEC filing indicating that they intended to avoid Phase III testing, and believed their clinical test results may be sufficiently strong as to demonstrate to U.S. and European authorities that Phase III testing was unnecessary. This impression upon the minds of potential investors was, in turn, built upon the representations of purportedly successful results in the CUPID 1 Stage 2 that Defendants repeatedly touted.

94. In a press release issued on April 10, 2014, the Company announced that CBER had granted Breakthrough Therapy designation to Mydicar based on the results of CUPID 1. Breakthrough Therapy designation is a process designed to expedite the development and review of drugs that are intended to treat a serious condition and demonstrate substantial improvement over available therapies. This was only the third Breakthrough Therapy designation ever awarded by CBER, and the first time it was ever awarded to a gene therapy program. In the press release, Defendant Zsebo again lauded the efficacy results from the previous clinical trial, saying that the "breakthrough therapy designation ***validates Mydicar's unique characteristics and clinical data to date*** . . . ."

95. In seeking Breakthrough Therapy designation, Celladon needed to provide only summary information to CBER. According to the *FDA Guidance*, a submission for Breakthrough Therapy Designation is to contain basic information that "in most cases . . . could be captured in approximately 10 to 20 pages." This information is to include, among other things, the basis for considering the drug to be one "intended to treat a serious condition" and the "preliminary clinical evidence that the drug may demonstrate substantial improvement over available therapies." The *FDA Guidance* emphasizes that "FDA does not expect the sponsor to submit primary data (data sets)," but rather the sponsor should describe the preliminary clinical evidence.

**J. Design of CUPID 2**

96. Following the completion of CUPID 1, and based on the Company's claim that Mydicar high-dose patients had seen demonstrable and statistically significant clinical benefits (despite substantial flaws in the data that essentially made the results of the efficacy trial statistically meaningless), Celladon advanced Mydicar to Phase IIb testing, which it described as CUPID 2. This was to be one of the largest gene therapy clinical trials ever conducted in the United States.

97. Celladon described CUPID 2 as "a phase 2b, double-blind, placebo controlled, multinational, multicenter, randomized event-driven study in up to 250 patients with moderate-to-severe heart failure with reduced ejection fraction and New York Heart Association functional class II to IV symptoms despite optimal therapy." The study used only the "high-dose" of Mydicar as specified in CUPID 1, and specifically sought out patients with a high risk for recurrent cardiovascular events requiring hospitalizations, and ascertained this risk by looking for elevated NT-proBNP (a biomarker of worsening heart failure) and/or recent heart failure hospitalization.

98. Unlike CUPID 1, however, CUPID 2 had two clearly defined investigatory endpoints. CUPID 2's "primary efficacy endpoint [was] time-to-recurrent events (HF-related hospitalizations, ambulatory worsening HF) in the presence of terminal events (all-cause death, heart transplant, LVAD implantation) at the primary analysis data cutoff." This predicted "success" point, improved time to recurrent events, differed significantly from any of the predefined efficacy endpoints identified in CUPID 1, including ***that*** trial's recurrent event analysis, and thus, the purportedly "successful" CUPID 1 outcome provided no basis for the Company to believe that CUPID 2 would ultimately be successful in meeting ***its*** primary endpoints.

99. CUPID 2's secondary efficacy endpoint was "time-to-first terminal event (defined as all-cause death, heart transplant and LVAD implantation)." The

study also identified other characteristics that would be analyzed on an exploratory basis, including change from baseline in a quality of life assessment, and 6-minute walk test.

100. The CUPID 2 investigators hypothesized, based on the results from CUPID 1, "that the risk of recurrent events adjusted for correlated terminal events is reduced for [Mydicar] compared with placebo." However, in order to meet the study's primary endpoint, CUPID 2 needed to show at least a 45% reduction in the risk of recurrent events (for patients who also eventually had terminal events). The clinical investigators made clear that the hypothesis and the study design intended to test that hypothesis were "based on the results of the earlier CUPID 1 phase 2 study," without pointing out the crucial and unapparent flaws in those results and the change in endpoint definitions.

101. Likewise, the sample size calculation and trial assumptions were based on "a conservative estimate of the anticipated magnitude of effect of [Mydicar] based on 12-month results from the CUPID 1 study that showed an 88% risk reduction in recurrent clinical events adjusted for correlated terminal events with high-dose [Mydicar] compared with placebo." Because CUPID 1 had purportedly demonstrated 88% reduction in recurrent events in the first 12 months following dosage, and an 82% reduction after three years, the primary endpoint in CUPID 2 appeared much easier to achieve, given that the trial would be deemed a success if there was only a 45% reduction. However, this comparison fails to take account of the fact that CUPID 2 used a different definition of events than CUPID 1, a change that likely would diminish the cascading event counts noted in ¶¶ 71-73 above and thus much less likely to yield a statistically significant efficacy outcome.

102. Although the CUPID 2 design was published in medical literature in early 2014, Celladon began enrolling and dosing CUPID 2 trial subjects as early as August 2012, when the Company announced that the first patient in CUPID 2

(Phase IIb) had been dosed. Upon this announcement, Defendant Zsebo again touted the results from CUPID 1 (a Phase IIa trial): "With the encouraging results from the preceding CUPID Stage 2 trial and the timely dosing of the first patient in this Phase IIb trial, we are firmly on track with our plan to develop a novel, safe, and effective therapy for patients with advanced heart failure." As with her previous statements lauding the same misleading results, she clearly was implying that those results should encourage anticipation of a positive CUPID 2 result.

103. Less than three months later, the Company also announced that the first European CUPID 2 trial patient had been dosed.

104. On March 4, 2014, Celladon announced that enrollment in CUPID 2 was complete, and that the Company expected to announce top-line results in April 2015. Despite knowing that the event definition had been changed, Celladon again highlighted the flawed data from CUPID 1 that purportedly showed a statistically significant 88% risk reduction for recurrent events at 12 months for those trial subjects who had been treated with high-dose Mydicar, and an 82% risk reduction for those subjects at 3 years after treatment, leading investors to anticipate similar results from CUPID 2.

### K. Celladon Raises $100 Million From Venture Capital Funds and the Capital Markets

105. On February 15, 2012, Celladon announced that it had received $43 million in venture capital financing from Pfizer Venture Investments, Novartis Venture Funds, Johnson & Johnson Development Corp., and other "partners."

106. In announcing this first round of financing, the Company highlighted the results of CUPID 1. Defendant Zsebo commented that "the positive results of the phase 2[a] CUPID trial demonstrated the potential of Mydicar to become an important treatment for patients with chronic, advanced heart failure."

107. These private investors made clear that the CUPID 1 results that had been lauded by the Company – and that formed the basis for Celladon's decision

to proceed to Phase IIb clinical trials – were central to their decision to invest. For example, Dr. Barbara Dalton of Pfizer Venture Investments, who was made Chair of Celladon's Board of Directors after Pfizer's investment in the Company, commented in the press release that "Mydicar has demonstrated clinical benefit in human trials and we believe that it has the potential to be a much needed new treatment option for patients with advanced heart failure."

108. Soon thereafter, on May 7, 2012, Celladon announced the completion of a second round of venture capital funding that netted the Company an additional $10 million from two additional partners, increasing Celladon's capital proceeds to $53 million.

109. Late in 2013, the Company decided to go public. The IPO commenced on January 30, 2014. Celladon offered 5.5 million shares of common stock at $8.00 per share, and raised $50.6 million in gross proceeds.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A. IPO Registration Statement

110. The Class Period begins on January 30, 2014. On October 11, 2013, the Company filed the initial public version of a Form S-1 Registration Statement and Prospectus with the SEC, and filed several amendments to the Form S-1 thereafter. The Registration Statement, including a Prospectus, was declared effective on January 29, 2014, and the IPO commenced the next day.

111. The Registration Statement was signed by the Individual Defendants, and stated:

> In Phase 2a of our CUPID 1 trial, 39 patients with systolic heart failure, . . . were enrolled in a randomized, double-blind, placebo controlled trial, where Mydicar was ***found*** to be safe and well-tolerated, ***reduced heart failure-related hospitalizations, improved patients' symptoms, quality of life and serum biomarkers, and improved key markers of cardiac function predictive of survival, such as end systolic volume. Based on these results, as well as our previous preclinical studies and clinical trials, we advanced Mydicar to an approximately 250-patient*** randomized, double-blind,

placebo-controlled international ***Phase 2b trial*** in patients with systolic heart failure, which we refer to as CUPID 2.

112. The Registration Statement also stated that:

> [T]he relative risk reductions or hazard ratios, at 12 months for the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.12, p=0.003 (where the p-value is the statistical probability of a result due to chance alone), representing a risk reduction of 88% for these important events with the high-dose Mydicar. At 36 months, the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.18, p=0.048, representing a risk reduction of 82% for these important events with high-dose Mydicar.

113. Immediately below this text appeared the following table, purporting to summarize the hazard ratios and risk reduction for Mydicar clinical trial patients:

| | Time to Multiple Clinical Events Analysis at 12 Months | |
|---|---|---|
| **MYDICAR Dose vs. Placebo** | **Hazard Ratio (CI) for Recurrent Clinical Events 1** | **Risk Reduction** |
| Low-dose | 0.40 (0.13, 1.21), p=0.11 | 60% |
| Mid-dose | 0.44 (0.16, 1.24), p=0.12 | 54% |
| High-dose | 0.12 (0.03, 0.49), p=0.003 | 88% |

1 Recurrent clinical events include WHF and MI.

114. While Defendants misled investors regarding the validity of the data analysis underlying the reported results of CUPID 1 and the magnitude of the risk that CUPID 2 outcome would not be positive based on the Company's stated CUPID 1 results, they nonetheless highlighted to investors the significant upside potential of Celladon common stock, by citing to statistics such as:

- One in five adults at age 40 would develop heart failure during their remaining lifetime;
- Approximately 250,000 to 500,000 patients in the United States were then in the terminal phase of heart failure that could not be effectively managed with available therapies;

- There were more than 280,000 heart failure-related deaths annually; and, most importantly;
- That the Company "estimate[d] that there were over 350,000 systolic heart failure patients in the United States alone who [would] be eligible for Mydicar treatment upon launch."

115. Shortly after the IPO closed in February, securities analysts covering Celladon echoed Defendants' statements concerning the reported efficacy of Mydicar as demonstrated by the results of CUPID 1. For example, on February 21, 2014, Wedbush PacGrow Life Sciences ("Wedbush") issued a report noting that "[t]he high dose . . . of MYDICAR demonstrated a statistically significant reduction of 82% in the risk of major cardiovascular events in the [] CUPID 1 trial, in addition to improvements in overall survival out to 3 years." Wedbush stated that notwithstanding the small size of the CUPID 1 trial, it was "encouraged by the large improvements in both cardiovascular events and overall survival, and the correlation between patient improvement and higher doses."

116. On February 24, 2014, Barclays Capital ("Barclays") initiated analyst coverage with a report citing the above Company-reported metrics from the CUPID 1 study, which were premised on flaws in trial design and data analysis. It noted that "[t]he three doses of MYDICAR were able to show a 60% (p = 0.11), 56% (p = 0.12), and 88% (p = 0.003) risk reduction in recurrent clinical events at 1 year," and that "[h]igh dose Mydicar demonstrated an 82% reduction out to 3 years (p = 0.048)."

117. Barclays also pointed out that these results were central to their analysis of Celladon:

> In our view, these phase 2a results demonstrate a clear signal that Mydicar is able to improve heart failure symptoms and potentially reduce the number of clinical events and cardiac related hospitalizations with a reasonably clean safety profile. In addition, longer-term

> results out to 3 years demonstrate that this benefit is sustainable.

118. Barclays was also reassured by the fact that the Company "conducted a number of sensitivity studies to evaluate [the baseline] imbalances and it was determined that the outcomes of the trial could not be explained by these imbalances alone."

119. The statements set forth in ¶¶ 111-113 above were materially false and misleading when made. Contrary to the statements that (i) high-dose Mydicar patients enrolled in CUPID 1 demonstrated an 88% reduction in hospitalizations at 12-months and an 82% reduction in hospitalizations at 3 years, (ii) that Mydicar had been found to "reduce[] heart-failure related hospitalizations, improve[] patients' symptoms, quality of life and serum biomarkers, and improve[] key markers of cardiac function predictive of survival," and (iii) the decision to proceed to Phase IIa testing was "based" on the results of CUPID 1, Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that CUPID 1 was so fundamentally flawed in design and execution that it could not be used as the basis to either find that Mydicar had, in fact, demonstrated those effects, or, therefore, to proceed to Phase IIb.

**B. 2013 Form 10-K and March 31, 2014 Conference Call**

120. On March 31, 2014, Celladon filed its Form 10-K Annual Report with the SEC for the year ending December 31, 2013 (the "2013 Form 10-K"). The Form 10-K was signed by Defendants Zsebo and Laba, and stated:

> In Phase 2a of our CUPID 1 trial, 39 patients with heart failure, . . . were enrolled in a randomized, double-blind, placebo controlled trial, Mydicar was safe and well-tolerated, ***reduced heart failure-related hospitalizations, improved patients' symptoms, quality of life and serum biomarkers, and improved key markers of cardiac function predictive of survival, such as end systolic volume. Based on these results, as well as our previous preclinical studies and clinical trials, we advanced Mydicar to a 250-patient***

> randomized, double-blind, placebo-controlled international ***Phase 2b trial*** in patients with [heart failure], which we refer to as CUPID 2.

121. The 2013 Form 10-K also stated that:

> [T]he relative risk reductions or hazard ratios, at 12 months for the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.12, p=0.003 (where the p-value is the statistical probability of a result due to chance alone), representing a risk reduction of 88% for these important events with high-dose Mydicar. At 36 months, the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.18, p=0.048, representing a risk reduction of 82% for these important clinical events with high-dose Mydicar.

122. Immediately below this text appeared the table set forth at ¶ 113 above, purporting to summarize the hazard ratios and risk reduction for Mydicar clinical trial patients.

123. While Defendants misled investors regarding the validity of the data analysis underlying the reported results of CUPID 1 and the magnitude of the risk that CUPID 2 outcome would not be positive based on the Company's stated CUPID 1 results, they nonetheless highlighted to investors the significant upside potential of Celladon common stock, by citing to statistics such as:

- One in five adults at age 40 would develop heart failure during their remaining lifetime;
- Approximately 250,000 to 500,000 patients in the United States were then in the terminal phase of heart failure that could not be effectively managed with available therapies;
- There were more than 280,000 heart failure-related deaths annually; and, most importantly;
- That the Company "estimate[d] that there were over 350,000 systolic heart failure patients in the United States

> alone who [would] be eligible for Mydicar treatment upon launch."

124. Defendants also held a conference call with analysts on March 31, 2014 to discuss the Company's financial results for 2013. During the call, Defendant Zsebo stated:

> In our previous clinical studies of MYDICAR, we had demonstrated initial safety and evidence of improvement in a number of parameters important in heart failure therapeutic assessments as well as improved clinical outcome. Specifically, our Phase 2a trial, which we referred to as CUPID 1, demonstrated that high dose MYDICAR provided substantial improvement when added to an optimized heart failure regimen.
>
> MYDICAR high does subjects had a decreased frequency of cardiovascular events, primary hospitalizations at 12 months versus placebo subject on optimized background therapy. Statistically measuring this treatment effect, we observed a hazard ratio of 0.12 or an 88% risk reduction of these cardiovascular events with a p-value of 0.003.

125. Zsebo also noted during the conference call that the Company had advanced Mydicar to a Phase IIb trial "***based on these very encouraging results.***" In response to a question from an analyst from Wedbush, Zsebo responded that "[i]n CUPID 1, ***all MYDICAR dose groups demonstrated a reduced hospitalization rate as well as reduced mortality***."

126. On April 10, 2014, Barclays issued an analyst report echoing Defendants' statements concerning the reported efficacy of Mydicar as demonstrated by the results from CUPID 1. In discussing the announcement of Breakthrough Therapy and Fast Track designations for Mydicar, Barclays said "Recall the CUPID-1 trial showed an 88% risk reduction in recurrent clinical events at 1 year (p = 0.003) and an 82% reduction at 3 years (p = 0.048)."

127. The statements set forth in ¶¶ 120-122, 124, 125 above were materially false and misleading when made. Contrary to the statements that (i) high-dose Mydicar patients enrolled in CUPID 1 demonstrated an 88% reduction

in hospitalizations at 12-months and an 82% reduction in hospitalizations at 3 years, (ii) that Mydicar had been found to "reduce[] heart-failure related hospitalizations, improve[] patients' symptoms, quality of life and serum biomarkers, and improve[] key markers of cardiac function predictive of survival," and (iii) the decision to proceed to Phase IIb testing was "based" on the results of CUPID 1, Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that CUPID 1 was so fundamentally flawed in design and execution that it could not be used as the basis to either find that Mydicar had, in fact, demonstrated those effects, or, therefore, to proceed to Phase IIb.

### C. April 10, 2014 Breakthrough Therapy Announcement

128. On April 10, 2014, Celladon issued a press release announcing its receipt of a Breakthrough Therapy Designation from the FDA. The press release described Mydicar as "Novel," and "First-in-class." Defendant Zsebo stated in the press release that the designation "***validate[d] Mydicar's unique characteristics and clinical data to date*** . . . ."

129. The statement set forth in ¶ 128 above was materially false and misleading when made. Contrary to the statements that the Breakthrough Therapy designation "validated" the "clinical data to date," Defendants knew or were reckless in not knowing, for all of the reasons alleged in Parts IV.F-I above, that the "clinical data to date," presumably the CUPID 1 results, were irremediably flawed, regardless of the Breakthrough Therapy designation.

### D. May 13, 2014 Conference Call

130. On May 13, 2014, Defendants held a conference call with analysts to discuss the Company's results for the first quarter of 2014, ending March 31, 2014.

131. During the call, Defendant Zsebo, speaking about the recent Breakthrough Therapy designation, stated that she believed that the designation: "***validate[d]*** Mydicar's unique characteristics and ***[was] a testament to the strength of [the] clinical data to date***, wherein the CUPID 1 trial MYDICAR high dose subjects had an 88% reduction of cardiovascular events with a p-value of 0.003."

132. The statement set forth in ¶ 131 was materially false and misleading when made. Contrary to the statements that the Breakthrough Therapy designation "validate[d] Mydicar's unique characteristics" and "[was] a testament to the strength of [the] clinical data to date," Defendants knew or were reckless in not knowing that the "clinical data to date," expressly stated to be the CUPID 1 test results, were not strong, as they were unreliable, regardless of that designation, and there was as yet no valid empirical basis upon which to characterize "Mydicar's unique characteristics," for all the reasons alleged in Parts IV.F-I above.

**E. Jefferies 2014 Global Healthcare Conference**

133. From June 2-5, 2014, Jefferies LLC held its 2014 Global Healthcare Conference in New York City, a meeting attended by a broad range of public and private healthcare companies and potential investors, including institutional investors, private equity investors and venture capital investors. Defendant Zsebo made a live presentation on behalf of Celladon at this conference on June 5, 2014.

134. Zsebo's PowerPoint presentation falsely highlighted Mydicar's "Promising Phase 2a Results: Gene Therapy Targeting SERCA2a Deficiency Demonstrated an 88% Reduction in Hospitalizations."




The slides also claim that "MYDICAR Reduced Adjudicated Heart Failure Clinical Events Through 12 Months (High Dose)";



that "MYDICAR High Dose Group Demonstrated Durable Reduced Recurrent Hospitalization";




and "MYDICAR Improved Overall Survival Through 3 Years of Follow Up";




without addressing the fact that the data and statistical analyses underlying that finding were fundamentally flawed, and thus formed no basis to proceed to CUPID 2 trials.

135. The statements set forth in ¶ 134 were materially false and misleading. Contrary to the statements that Mydicar "demonstrated an 88% reduction in hospitalizations," "reduced adjudicated heart failure clinical events through 12 months," and "improved overall survival through 3 years of follow up," Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that the Phase IIa study was so fundamentally flawed in design and in execution that it could not be the basis to claim that ***Mydicar*** had ***demonstrated*** any reduction in hospitalizations, or ***reduced*** adjudicated heart failure clinical events, or ***improved*** overall survival through three years.

**F. August 7, 2014 Press Release and Conference Call**

136. On August 7, 2014, Celladon issued a press release announcing its financial results for the second quarter of 2014, ending June 30, 2014. In the

press release, Defendant Zsebo again stated that the Breakthrough Therapy designation "***validate[d] Mydicar's unique characteristics and clinical data to-date . . . .***"

137. The same day, Defendants held a conference call with analysts to discuss the Company's financial results. During the call, Defendant Zsebo, speaking about the recent Breakthrough Therapy designation, stated that she believed that the designation:

> ***validate[d] Mydicar's unique characteristics and [was] a testament to the strength of [the] clinical data to-date***, where in the CUPID 1 trial MYDICAR high dose subjects had an 88% reduction of cardiovascular events with a p-value of 0.003.

138. The statements set forth in ¶¶ 136-137 above were materially false and misleading when made. Contrary to the statements that the Breakthrough Therapy designation "validate[d] Mydicar's unique characteristics and [was] a testament to the strength of the clinical data to-date" and that "the CUPID 1 trial MYDICAR high dose subjects had an 88% reduction in cardiovascular events," Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that none of the findings of CUPID 1 were "valid" or that the "clinical data to-date," which were expressly stated as referring to CUPID 1, were strong, as they were unreliable.

**G. Secondary Stock Offering**

139. On August 7, 2014, Celladon filed a final Form S-1 Registration Statement and Prospectus for a secondary public offering of its common stock, which filing was made effective on August 12, 2014. Celladon offered 4.6 million shares at $9.50 per share and raised gross proceeds of $43.7 million. The Registration Statement was signed by Defendants Zsebo and Laba, and stated:

> In Phase 2a of our CUPID 1 trial, 39 patients with systolic heart failure, . . . were enrolled in a randomized, double-blind, placebo controlled trial, where Mydicar was ***found*** to be safe and well-tolerated, ***reduced heart failure-related hospitalizations, improved patients' symptoms, quality of life and serum biomarkers, and***

> ***improved key markers of cardiac function predictive of survival, such as end systolic volume. Based on these results, as well as our previous preclinical studies and clinical trials, we advanced Mydicar to a 250-patient*** randomized, double-blind, placebo-controlled international ***Phase 2b trial*** in patients with heart failure, which we refer to as CUPID 2.

140. The Registration Statement also stated that:

> [T]he relative risk reductions or hazard ratios, at 12 months for the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.12, p=0.003 (where the p-value is the statistical probability of a result due to chance alone), representing a risk reduction of 88% for these important events with the high-dose Mydicar. At 36 months, the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.18, p=0.048, representing a risk reduction of 82% for these important events with high-dose Mydicar.

141. Immediately below this text appeared a table identical to that set forth in ¶ 113 above, purporting to summarize the hazard ratios and risk reduction for Mydicar clinical trial patients.

142. While Defendants misled investors regarding the validity of the data analysis underlying the reported results of CUPID 1 and the magnitude of the risk that CUPID 2 outcome would not be positive based on the Company's stated CUPID 1 results, they nonetheless highlighted to investors the significant upside potential of Celladon common stock, by citing to statistics such as:

- One in five adults at age 40 would develop heart failure during their remaining lifetime;
- Approximately 250,000 to 500,000 patients in the United States were then in the terminal phase of heart failure that could not be effectively managed with available therapies;
- There were more than 280,000 heart failure-related deaths annually; and, most importantly;

- That the Company "estimate[d] that there were over 350,000 systolic heart failure patients in the United States alone who [would] be eligible for Mydicar treatment upon launch."

143. The statements set forth in ¶¶ 139-141 above were materially false and misleading when made. Contrary to the statements that (i) high-dose Mydicar patients enrolled in CUPID 1 demonstrated an 88% reduction in hospitalizations at 12-months and an 82% reduction in hospitalizations at 3 years, (ii) that Mydicar had been found to "reduce[] heart-failure related hospitalizations, improve[] patients' symptoms, quality of life and serum biomarkers, and improve[] key markers of cardiac function predictive of survival," and (iii) the decision to proceed to Phase IIb testing was "based" on the results of CUPID 1, Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that CUPID 1 was so fundamentally flawed in design and execution that it could not be used as the basis to either find that Mydicar had, in fact, demonstrated those effects, or, therefore, to proceed to Phase IIb.

### H. Late 2014 Analyst Reports Confirm Materiality of Statements Touting Mydicar's Efficacy Based on CUPID 1

144. Throughout the remainder of 2014, various analysts took note of the facially impressive efficacy outcomes of CUPID 1, which – unbeknownst to the investing public – were actually premised on multiple and material study methodology and data analysis flaws.

145. For example, on September 26, 2014, LifeSci Capital initiated coverage of Celladon, noting that "Successful CUPID 1 Phase I/IIa Trial Supports Development of MYDICAR," and that:

> Patients receiving the high-dose MYDICAR treatment exhibited lower levels of biomarker signatures of heart failure, had higher concentrations ($VO_2$max), and had a lower end-systolic volume than that of controls. Most

> importantly, after three years of follow up, there was a significant 82% reduction in the frequency of non-terminal events, as measured by hospitalizations and myocardial infarctions, for MYDICAR treated patients compared to placebo (p = 0.048).

146. Credit Suisse, in initiating analyst coverage on October 13, 2014, emphasized the positive CUPID 1 results in rate the stock "outperform," stating that "Mydicar High-Dose stabilized or improved various clinical parameters relative to placebo," and noting the purported risk reduction by 88% at 12 months and 82% at 3 years.

147. Further, Credit Suisse pointed to the patient baseline imbalances noted in the CUPID 1 results and stated that the "[p]ost-hoc sensitivity analyses [] suggest that the clinical impact of Mydicar High-Dose could not be fully explained by these [baseline] differences." Credit Suisse was thus reassured by the post-hoc corrections implemented in CUPID 1, which were arbitrary, biased and flawed, and ultimately did nothing to eliminate the inherent errors present in that study's data analyses.

### I. Best of *Circulation* Research Symposium

148. On November 16, 2014, Defendant Zsebo presented at the American Heart Association's Best of *Circulation* Research Symposium in Chicago. In summary, the presentation noted that:

> - Clinical event rates are significantly lower three years following gene transfer in the high dose group compared to the placebo group.
>
> [and]
>
> - [T]he high dose met the prespecified primary endpoint at 6 months, reduced HF hospitalizations at 1 and 3 years, trended in improved survival, and demonstrated the persistence of the transgene at late time points.

Zsebo summarized the comparison between the high-dose and placebo groups using this PowerPoint slide:




149. Zsebo also used the below slide to summarize the overall outcome from CUPID 1:




150. The statements set forth in ¶¶ 148-149 above were materially false and misleading when made. Contrary to the statements that rates of clinical events were significantly lower in the high dose group versus the placebo group,

and that the "high dose met the prespecified primary endpoint at 6 months, [and] reduced HF hospitalizations at 1 and 3 years," Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above, that the positive patient outcomes they touted were the result of statistically invalid data analyses that concealed fundamental flaws in the study methodology and data analyses, and, therefore, it could not be said that Mydicar had been found to demonstrate these effects.

### J. Early 2015 Analyst Reports and Commentary Confirm That Unreliable CUPID 1 Results Led Market to Believe That CUPID 2 Would Be Successful

151. On January 7, 2015, an article titled "Celladon's Cardiovascular Fast Track MYDICAR Candidate Could Provide Upside" was posted on *Seeking Alpha*, the influential online content service for financial markets. The author was bullish about Celladon's prospects, citing the stock as a potential "wealth builder for early investors ahead of its April Phase 2b data release," and included the following analysis:

> What we find interesting in digging through materials is the following points. Phase 1 CUPID trial had only 39 patients, and this one has 250. **The endpoint is the key, and it looks like a low hurdle to jump** which could then directly bypass (Pun intended) a Phase 3 requirement due to the Breakthrough Therapy status. In the CUPID 1 trial, the 1-year data showed hazard ratio of 0.12, risk reduction 88%, p=0.003. In Phase II, the primary end point is risk reduction of 45%, HR 0.55. So they have a very good shot at being able to clear those hurdles in our opinion with only a 45% level to climb, whereas they hit 88% in Phase 1.
> [Emphasis in original.]

152. On January 22, 2015, Wedbush issued an analyst report titled "Revising our Risk Assessment Ahead of CUPID2," rating Celladon stock as "outperform" and raising its 12-month price target from $17 to $29. The report offered a "fine-tune[d]" risk-reward assessment because "[t]he unblinding of the Ph 2b CUPID2 trial remains set for April," an event Wedbush referred to as "binary." Under its base case scenario, Wedbush expected

> Mydicar to meet the primary endpoint, based on the significant and durable [88%] reduction in recurrent hospitalization (p = 0.003, HR = 0.12 at 1yr) observed with high-dose Mydicar (n=9) in CUPID1. Recall also that only 2/9 (23%) patients in the high-dose Mydicar group experienced a clinical event in the 12 months post-administration, compared to 7/14 (50%) in the placebo group.

153. On March 31, 2015, Wedbush issued a report reiterating that the "CUPID2 readout is a binary event, but we see significant upside if it is successful. We have maintained that the most likely outcome of CUPID2 is Mydicar reaching both the primary and secondary endpoints." This prediction was based on the same data Wedbush cited in its January 22, 2015 report.

### K. 2014 Form 10-K

154. On March 31, 2015, Celladon filed its Form 10-K Annual Report for the year ending December 31, 2014 with the SEC (the "2014 Form 10-K"). The Form 10-K was signed by Defendants Zsebo and Laba, and stated:

> In Phase 2a of our CUPID 1 trial, 39 patients with systolic heart failure, . . . were enrolled in a randomized, double-blind, placebo controlled trial, where Mydicar was safe and well-tolerated, ***reduced heart failure-related hospitalizations, improved patients' symptoms, quality of life and serum biomarkers, and improved key markers of cardiac function predictive of survival, such as end systolic volume. Based on these results, as well as our previous preclinical studies and clinical trials, we advanced Mydicar to an approximately 250-patient*** randomized, double-blind, placebo-controlled international ***Phase 2b trial*** in patients with heart failure, which we refer to as CUPID 2.

155. The 2014 Form 10-K also stated that:

> [T]he relative risk reductions or hazard ratios, at 12 months for the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events . . . was 0.12, p=0.003 (where the p-value is the statistical probability of a result due to chance alone), representing a risk reduction of 88% for these important events with the high-dose Mydicar. At 36 months, the high-dose Mydicar group versus placebo for recurrent adjudicated clinical events was 0.18, p=0.048, representing a risk reduction of 82% for these important clinical events with high-dose Mydicar.

156. Immediately below this text appeared a table identical to that set forth at ¶ 113 above, purporting to summarize the hazard ratios and risk reduction for Mydicar clinical trial patients.

157. While Defendants misled investors regarding the validity of the data analysis underlying the reported results of CUPID 1 and the magnitude of the risk that CUPID 2 outcome would not be positive based on the Company's stated CUPID 1 results, they nonetheless highlighted to investors the significant upside potential of Celladon common stock, by citing to statistics such as:

- One in five adults at age 40 would develop heart failure during their remaining lifetime;
- Approximately 250,000 to 500,000 patients in the United States were then in the terminal phase of heart failure that could not be effectively managed with available therapies;
- There were more than 280,000 heart failure-related deaths annually; and, most importantly;
- That the Company "estimate[d] that there were over 350,000 systolic heart failure patients in the United States alone who [would] be eligible for Mydicar treatment upon launch."

158. The statements set forth in ¶¶ 154-156 above were materially false and misleading when made. Contrary to the statements that (i) high-dose Mydicar patients enrolled in CUPID 1 demonstrated an 88% reduction in hospitalizations at 12-months and an 82% reduction in hospitalizations at 3 years, (ii) that Mydicar had been found to "reduce[] heart-failure related hospitalizations, improve[] patients' symptoms, quality of life and serum biomarkers, and improve[] key markers of cardiac function predictive of survival," and (iii) the decision to proceed to Phase IIb testing was "based" on the

results of CUPID 1, Defendants knew or were reckless in not knowing, for all the reasons alleged in Parts IV.F-H above CUPID 1 was so fundamentally flawed in design and execution that it could not be used as the basis to either find that Mydicar had, in fact, demonstrated those effects, or, therefore, to proceed to Phase IIb.

159. In summary, the statements set forth in ¶¶ 111-113, 120-122, 124, 125, 128, 131, 134, 136-137, 139-141, 148-149, and 154-156 above were materially false and misleading when made because (i) as a result of the multiple flaws in the design and execution of the CUPID 1 clinical trial, including, among others, the use of a placebo group significantly sicker than the treatment group and the lack of any single pre-defined primary endpoint, the reported results of CUPID 1 provided no sound statistical evidence supporting the efficacy of Mydicar; (ii) the post-hoc "sensitivity analysis" conducted following CUPID 1 was non-standard, failed to correct for the impact of the patient baseline imbalances on the results, and did not form a statistical basis to support a conclusion relating to the efficacy of Mydicar; (iii) other CUPID 1 analyses designed and conducted only after testing was completed, such as the recurrence test, were severely flawed; and (iv) accordingly, the reported results of CUPID 1 provided no insight into the likelihood of success of the CUPID 2 clinical trial.

### L. In Eager Anticipation of CUPID 2 Results, Analysts and Commentators Predict Positive Outcome Based on CUPID 1 Data

160. Analysts were led to believe that CUPID 2 would be successful based on the materially false and misleading statements alleged above.

161. H.C. Wainwright & Co. initiated coverage on April 7, 2015, giving Celladon stock a "buy" rating and a $31 price target:

> We maintain a bias that CUPID 2 data expected in April should achieve its endpoint.

* * *

> We believe CUPID 1 results are ***compelling*** and see a few reasons why CUPID 2 data endpoint (Phase 2b) should be achievable. CUPID 2 trial enrolled 250 patients (completed February 2015) internationally . . . with primary endpoint of at least 45% reduction in Time-to-Recurrent Heart Failure Related Hospitalizations and secondary endpoint of Time-to-First Terminal Event through one year. Compared to CUPID 1 results that demonstrated statistically significant risk reduction of 88% through one year (p=0.003) and 82% through three years (p=0.048) versus [placebo], we believe this primary endpoint is ***extremely conservative*** and hence achievable.

162. A LifeSci Capital report issued on April 9, 2015 noted that "[t]he [Phase IIb] data release has been eagerly anticipated since the completion of patient enrollment in March 2014. Positive results have the potential to be a major catalyst for growth for Celladon." The report stated that "Successful CUPID 1 Trial Supports the Ongoing Development of MYDICAR."

163. On April 20, 2015, *Seeking Alpha* posted an article by Jason Ditz titled "Celladon: A Good Deal, And A Rare Buy-Write Opportunity." Ditz stated that Mydicar is a "hugely promising heart treatment," and "[a]s the study results progress, there is a belief that the FDA will fast-track it for approval." He wrote that "[t]he smart play on CLDN is to buy shares and sell calls," and offered a trading strategy where:

> [b]y selling covered calls to some eager option trader, we've capped our gains at 120%, but we've also given ourselves a substantial cushion. Celladon could even lose a few bucks a share in the next month and we'd still make a respectable return. We only lose if the stock absolutely craters.

## VI. THE TRUTH BEGINS TO EMERGE

164. The bottom began to fall out for Celladon on April 22, 2015. On that date, before the market opened, *Seeking Alpha* posted an article by Blair O'Neill titled "CUPID-2 Is Likely To Fail." Awaiting the CUPID 2 readout, O'Neill focused on the patient baseline imbalances between the treatment and

placebo arms in CUPID 1 and, for the first time in any publicly disseminated examination of this issue, cut through Celladon's reassurances:

> [T]he placebo performed better than the low and mid doses, and so we really can't say there was actually a dose response. In addition, the LVEF data was confounded by dying patients.
>
> Alarmingly, only 1 of the remaining 16 efficacy endpoints showed some kind of dose response while also exhibiting a consistent benefit over the placebo arm. That 1 efficacy endpoint was the mortality rate, but there were so few deaths within the 12-month period that it is probably foolish to trust it.
>
> Even if we just ignored the lower dosage arms, and just focused on the high dose arm, ***Celladon still wouldn't have a good case for Mydicar's efficacy. Why? Extensive baseline imbalances.***
>
> In almost all of the measurements, the experimental arms had healthier baseline levels than the placebo arm. Even among the experimental arms, the higher dosed patients typically had healthier baseline levels than seen among the lower dosed patients.
>
> * * *
>
> Ultimately, I consider the efficacy results of CUPID-1 to be ***inconclusive***. It seems more likely that baseline patient characteristics provided more relevant factors for success, than did improved SERCA2a levels. Therefore, in the larger CUPID-2 trial where patient baselines are more balanced, it seems unlikely that MYDICAR will achieve the needed 45% risk reduction on the primary endpoint in order to show statistical significance. I think Celladon needs to either run a larger trial to show a more modest clinical benefit with the current primary endpoint, use a more aggressive dosing regimen, and/or use a different primary endpoint.

165. O'Neill estimated an 80% chance of poor CUPID 2 results, a 5% probability (or random chance) of statistically significant results for CUPID 2, and a 15% probability of a statistically significant result in a subgroup of the CUPID 2 trial population.

166. As a result of this news, the price of Celladon stock fell ***17%***, from a closing price of $16.36 per share on April 21, 2015 to a closing price of $13.59

per share on April 22, 2015. This drop constituted a material decline on significant trading volume of more than 2.6 million shares, and occurred when the overall S&P 500 index was relatively flat, removing artificial inflation caused by Defendants' fraud and causing Lead Plaintiff and the Class to suffer economic damages.

167. O'Neill's article, however, did not address Celladon's post-hoc sensitivity analyses, which, as alleged above, were themselves significantly flawed, arbitrary and biased, but had reassured investors that the patient baseline imbalances did not cause the purportedly positive CUPID 1 results. As such, and because the article did not address all of the flaws in the study and the results of CUPID 2 had not yet been announced, O'Neill's article constituted a partial curative disclosure and the stock remained artificially inflated.

168. Celladon's long-awaited announcement of the CUPID 2 results was a bombshell. On April 26, 2015, a Sunday, Celladon issued a press release titled "Celladon Reports Negative Results for CUPID2 Trial of MYDICAR in Advanced Heart Failure – Investigational gene therapy fails to meet primary and secondary endpoints." The Company revealed that Mydicar did not meet ***any*** of its primary, secondary, or other exploratory endpoints, and accordingly that Mydicar was not found to be effective compared to placebo. As disclosed in the press release, the hazard ratio was 0.93, which means that Mydicar showed only a 6% or 7% improvement over placebo. The primary endpoint showed a p-value of 0.81, far short of the threshold for statistical significance.

169. Analysts were shocked. Wedbush stated in its April 27, 2015 report that "[t]he negative outcome validates the bear argument that the benefit observed with high-dose Mydicar in the nine patients in CUPID1 was indeed due to chance." Roth Capital Partners noted in a report the same day that CUPID 2 had "Failed on All Fronts" and that Mydicar showed "No Hint of Efficacy." In its April 28, 2015 report, H.C. Wainwright termed the CUPID 2 results a

"Significant Disappointment" and acknowledged that "[b]ased on our analysis of CUPID 1, we had been biased that the company would achieve its endpoints."

170. As a result of the April 26, 2015 news, the price of Celladon stock plummeted ***80%***, from a closing price of $13.68 per share on April 24, 2015 (Friday) to a closing price of $2.64 per share on April 27, 2015 (Monday). This drop constituted a material decline on extraordinary trading volume of more than 32.3 million shares, and occurred when the overall S&P 500 index was relatively flat, removing artificial inflation caused by Defendants' fraud and causing Lead Plaintiff and the Class to suffer economic damages.

171. Celladon stock remained artificially inflated, however, because Defendants continued to conceal the fact that there was no reliable clinical evidence that Mydicar could ever be a viable treatment for heart failure. Defendants offered no reason in the April 26, 2015 press release as to why the CUPID 2 trial failed; to the contrary, Zsebo stated in the press release that "we are rigorously analyzing the data in an attempt to better understand the observed outcome." Celladon held a special conference call with analysts on Monday morning, April 27, 2015, which Zsebo led. During the call, Zsebo advised that the Company was working on understanding the CUPID 2 results and, in particular, "whether the failure of CUPID 2 was a lack of efficacy of MYDICAR in heart failure in general, or because we did not get adequate delivery of the gene into the heart."

172. As such, Zsebo left open the possibility that the Mydicar gene therapy itself was not the problem, but rather the vector used to deliver the Mydicar to the patient. For all the market knew, the reported CUPID 1 results were still valid and the Company could re-run the CUPID 2 study with a better delivery device. H.C. Wainwright noted in its April 28, 2015 analyst report that:

> Celladon is in the process of analyzing its trial data and plans to report the full results in a medical conference (to be announced in the future) within the next few months. A better understanding of the results should

> help the company determine if there is any value left in its other MYDICAR targeted indications. Specifically, management is interested in analyzing the PCR data to see if MYDICAR was adequately delivered into cardiomyocytes or if there is an underlying problem of efficacy.

173. On April 30, 2015, Celladon announced its first quarter 2015 financial results and that in the wake of the failure of the CUPID 2 trial, the Company's board had approved a 50% reduction in workforce, from 34 full-time employees to approximately 17.

174. On June 1, 2015, the Company issued a press release titled "Celladon Corporation Announces Strategic Direction Following Review of CUPID2 Data." The release announced that the Company was commencing a process to seek an acquisition or partnership, and was retaining Wedbush Pac Grow Healthcare Securities as its financial advisor with respect to the transaction. The Company also announced that Defendant Zsebo had resigned her positions as CEO and a member of the Board of Directors pursuant to a leadership succession plan unanimously approved by the Board.

175. The full extent of the undisclosed risks undertaken by the Class materialized on June 26, 2015. On that date, before the market opened, Celladon issued a press release titled "Celladon Corporation Provides Business Update," announcing that the Company was suspending further research or development of its Mydicar program and all other pre-clinical programs. The Company also announced that there would be a second set of layoffs, with about half of the approximately 17 remaining employees to be terminated during the third quarter. Last, the Company announced that it was continuing to seek a merger or sale.

176. As a result of this news, the price of Celladon stock fell ***38%***, from a closing price of $2.20 per share on June 25, 2015 to a closing price of $1.35 per share on June 26, 2015. This drop constituted a material decline on unusually heavy trading volume of nearly 9.1 million shares, and occurred when the overall

S&P 500 index was relatively flat, removing artificial inflation caused by Defendants' fraud and causing Lead Plaintiff and the Class to suffer economic damages.

177. In sum, Celladon common stock lost 95% of its value between its Class Period high closing price of $27.26 on March 19, 2015 and its closing price on June 26, 2015.

## VII. POST-CLASS PERIOD EVENTS

178. Celladon ultimately may avoid liquidation, but will not survive in its present form. Celladon searched hat-in-hand for a buyer until November 19, 2015, when the Company announced that it agreed to be acquired by privately held Eiger BioPharmaceuticals in a reverse merger. Upon the closing of the transaction, which is expected to occur during the first half of 2016, Eiger shareholders will become the majority owners of the Company, and all of Celladon's remaining officers and directors (including Defendant Laba) will resign. The Company will be named Eiger BioPharmaceuticals, Inc. and will be run by Eiger's current senior management team under Eiger's current CEO. Eiger will then designate a new seven-member Board of Directors.

179. On February 26, 2016, the trading day before the date of this Complaint, Celladon stock closed at $0.90 per share.

## VIII. ADDITIONAL INDICIA OF SCIENTER

180. As alleged herein, during the Class Period, Defendants had actual knowledge of the false and misleading nature of the statements they made or acted with reckless disregard of the true information known to them. In so doing, Defendants committed acts, and practiced and participated in a course of conduct that operated as a fraud or deceit on purchasers of Celladon securities during the Class Period.

181. As more fully alleged above, Defendants acted with scienter in that they knew that the public documents or statements issued or disseminated in the

name of the Company were false and misleading, knew that these statements or documents or statements were issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme by Celladon, their control over and receipt or dissemination of the Company's materially false and misleading statements, and their associations with the Company that made them privy to material nonpublic information concerning Celladon.

**A. Nature of Flawed CUPID 1 Trial**

182. As alleged in Part IV.G above, the post-hoc "sensitivity analyses" which CUPID 1 claimed all but eliminated the possibility of the finding of efficacy was a result of error, conveniently saved Defendants the cost and delay of having to re-conduct a Phase IIa clinical trial. Of significance, the Company's ultimate success depended on successful commercial production of Mydicar, and that was entirely dependent on proceeding as soon as possible to Phase IIb testing. As alleged herein, going back to the design stage for another Phase IIa study would entail a delay of at least several years. This was not a viable option for Celladon. First, the cost of re-conducting such a trial would have been substantial. At approximately $5-10 million for a trial such as CUPID 1, paying for such testing a second time would have been a material expense for a company such as Celladon that was entirely dependent on cash infusions from investors. Second, any delay in completing clinical trials for Mydicar could have a significant impact on the Company's ability to compete against other products in the clinical trial pipeline targeted at NYHA Class III heart failure, such as Sunshine Heart's C-Pulse and Novartis' LCZ696.

183. Also, as alleged in Parts IV.G and IV.K above, the CUPID 1 results were published only a few months prior to the Company's efforts to attract

private investors through rounds of venture capital funding. Both the purported CUPID 1 results and Celladon's public decision to proceed with Phase IIb testing based on the "encouraging results" of CUPID 1 were central to these venture capital investors' decisions to invest, providing a strong motive for Defendants' misrepresentations. These investors, which included the "Big Pharma" companies Pfizer, Novartis, and Johnson & Johnson, were induced to provide Celladon with much-needed funding in the amount of $53 million based on the false public impressions that Defendants successfully created, all of which concealed the fact that CUPID 2 was, in fact, a huge gamble. That is, the undisclosed significant number of flaws in the design and execution of CUPID 1 prevented a reasonable investor from accurately ascertaining the substantial magnitude of the risk that the CUPID 2 clinical trial would fail.

184. Also, as alleged in Part IV.G above, each of the multiple statistical flaws and biases identified in ¶¶ 62-75 above point only in the direction of proving efficacy. In the presence of so many numerous statistical flaws and errors in CUPID 1, the fact that each one individually points in favor of what would ultimately be determined to be "false positive" results after corrective analyses is suspiciously supportive of the Company's desired outcome from the trial, and is highly indicative of scienter.

### B. Mydicar Was Celladon's Only Viable Product Candidate

185. In addition, a strong inference of scienter arises based on the very nature of the issues about which Defendants are alleged to have misled the investing public. Celladon was a development-stage biotech company that devoted substantially all of its resources to research and development of Mydicar. Mydicar was the only Celladon product candidate to have undergone clinical trials as of the start of the Class Period, and Mydicar was Celladon's only product candidate during the Class Period. Mydicar was essentially the sole function of

Celladon's operations, and the Company's ultimate ability to obtain revenue through product sales depended on the successful development of Mydicar.

186. The failure of Mydicar as a viable product candidate during the course of the FDA approval process would spell disaster for Celladon and its investors. As Celladon candidly acknowledged in its IPO Registration Statement:

> our ability to generate product revenues and to achieve commercial success in the near term will initially depend almost entirely on our ability to successfully develop, obtain regulatory approval for and then successfully commercialize Mydicar for the treatment of systolic heart failure in the United States or the European Economic Area.

187. These facts, together with the centrality of Mydicar to the Company's research and development efforts and ability to continue in business, and the complete divergence between the reported results of CUPID 1 and CUPID 2, support a strong inference that Defendants knew or recklessly ignored the fact that the CUPID 1 test results were fundamentally flawed for the reasons alleged in detail in Parts IV.F-H above.

### C. Celladon Was a Small Company and the Individual Defendants Were Closely Involved in Mydicar and the CUPID Trials

188. Further strong indicia are provided by the roles and behavior of the Individual Defendants. Celladon was a small, development-stage company, with one set of offices and only 34 employees at the Company's height. Both before and after the IPO, and throughout the Class Period, Defendants Zsebo and Laba worked side-by-side and were hand-on executives, closely familiar with all of the Company's research and development and the Mydicar project in particular. Before and during the Class Period, Zsebo represented and spoke for the Company at all analyst conference calls and industry conferences.

189. Defendant Zsebo, as CEO and a member of the Board of Directors, and as an investigator on both CUPID 1 and CUPID 2 and a co-author of all of the published designs and results, was deeply involved in all aspects of both

clinical trials, including the permutation tests and post-hoc sensitivity analyses. Zsebo knew, or was reckless in not knowing, that the design and reported positive results of CUPID 1 were flawed and unreliable, and thus did not provide a reasonable basis for a view, that Defendants conveyed to the market, that CUPID 2 would meet its endpoints.

190. Until 2012 (following the publication of results from CUPID 1 and the receipt of an SPA from the FDA), Celladon had only three executive officers: Defendants Zsebo and Laba, and Jeffrey J. Rudy ("Rudy"), the VP of Clinical Operations. Rudy received a B.S. in Microbiology from Ohio State University in 1991, and prior to joining Celladon in 2006, had worked in various roles responsible for clinical research and clinical operations for other biotechnology companies such as Amgen (1991-94); Gilead Sciences (1994-97); and Agouron Pharmaceuticals (1997-2006). Up through the time of the IPO, the Company would take on only two additional executive officers. The fact that the Individual Defendants were each a member of such a small group of Company executives (especially during the time when CUPID 1 was being conducted and analyzed) further supports a strong inference that each received directly any and all Company information concerning the flawed and unreliable data from CUPID 1 and the true magnitude of the risk that CUPID 2 would show that Mydicar had no significant clinical effect, providing further strong support for a finding of scienter.

### D. Defendant Zsebo Was Fired Because of the CUPID 2 Disaster

191. As alleged in Parts I, and VI above, Defendant Zsebo was fired as CEO and removed from the Board of Directors in the wake of the disastrous CUPID 2 results. Although the Company self-servingly described Zsebo's departure as a "resignation," the timing and unanimous Board action raises a strong inference that the Company held her personally responsible for a debacle

in which she, for years, had touted the reported results of CUPID 1 as an indication of what further testing would yield, only to have such testing reveal the complete opposite, a failure in all respects. The manner in which the Company treated its longtime leader and CEO, after ten years with the Company, shows a complete lack of trust in her prior representations to the investing public.

**E. Insider Stock Sales**

192. The volume and timing of insider selling during the Class Period raises a strong inference that the Individual Defendants knew that there was a substantial likelihood that Mydicar would not be found effective in CUPID 2, based on their knowledge that the flawed CUPID 1 analysis provided no legitimate basis upon which to proceed to CUPID 2 trials. At the same time that Defendants misled the market about the prospects of the CUPID 2 trial and the viability of Mydicar, the Individual Defendants sold hundreds of thousands of Celladon shares for proceeds exceeding $5.5 million.

193. Between December 2014 and early April 2015 – before the first partially curative disclosure – Zsebo and Laba together unloaded more than $5.5 million worth of personally held Celladon stock through the exercise of stock options. Zsebo's and Laba's sales, consummated when they each possessed undisclosed adverse information, further support a strong inference of scienter.

194. Zsebo sold 226,397 Celladon shares for gross proceeds of $4,163,819 during the Class Period. As set forth in the table below, these sales occurred between December 2014 and April 2015, when Celladon stock traded at artificially inflated and historically high prices owing to Defendants' false and misleading statements about CUPID 1 and the prospects for the success of CUPID 2, and in anticipation of the CUPID 2 results.

**Celladon Corp (CLDN)**
Insider Stock Sales
June 2014 - April 2015

| Filer Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Zsebo (Krisztina M) | 09-Dec-2014 | 41,302 | $15.00 | $619,530 |
| | 06-Jan-2015 | 41,302 | $17.51 | $723,198 |
| | 09-Feb-2015 | 41,302 | $15.85 | $654,637 |
| | 09-Feb-2015 | 6,629 | $15.94 | $105,666 |
| | 09-Mar-2015 | 6,629 | $24.71 | $163,803 |
| | 09-Mar-2015 | 41,302 | $24.81 | $1,024,703 |
| | 06-Apr-2015 | 41,302 | $18.16 | $750,044 |
| | 06-Apr-2015 | 6,629 | $18.44 | $122,239 |
| | | 226,397 | | $4,163,819 |

195. As of December 8, 2014, according to Celladon SEC filings, Zsebo held 597,114 options on Celladon common stock. On December 9, 2014, she exercised 41,302 options, which were approximately 7% of the options she held at that time, and immediately sold the shares for gross proceeds of $619,530. On January 1, 2015, Zsebo was awarded an additional 275,000 options, bringing her total options holdings to 830,812. Between January 1, 2015 and April 25, 2015, Zsebo exercised a total of 185,095 options—22.28% of her holdings—and immediately sold the shares for total gross proceeds of $3,544,289. To the extent that any of Zsebo's stock options were not fully vested and exercisable at the time of the sales listed above, these 7% and 22.28% percentages of holdings sold would be proportionally higher.

196. Laba sold 79,012 Celladon shares for gross proceeds of $1,339,793 during the Class Period. As set forth in the table below, these sales occurred between December 2014 and April 2015, when Celladon stock traded at artificially inflated and historically high prices owing to Defendants' false and misleading statements about CUPID 1 and the prospects for the success of CUPID 2, and in anticipation of the CUPID 2 results.

**Celladon Corp (CLDN)**
Insider Stock Sales
June 2014 - April 2015

| Filer Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Laba (Rebecque J) | 05-Dec-2014 | 20,000 | $12.77 | $255,400 |
| | 07-Jan-2015 | 20,000 | $17.30 | $346,000 |
| | 06-Feb-2015 | 4,000 | $16.08 | $64,320 |
| | 06-Feb-2015 | 10,000 | $16.08 | $160,800 |
| | 06-Mar-2015 | 4,000 | $22.48 | $89,920 |
| | 06-Mar-2015 | 10,000 | $23.29 | $232,900 |
| | 02-Apr-2015 | 10,000 | $17.33 | $173,300 |
| | 02-Apr-2015 | 1,012 | $16.95 | $17,153 |
| | | 79,012 | | $1,339,793 |

197. As of December 4, 2014, according to Celladon SEC filings, Laba held 149,738 options on Celladon common stock. On December 5, 2014, she exercised 20,000 options, which were approximately 13.35% of the options she held at that time, and immediately sold the shares for gross proceeds of $255,400. On January 1, 2015, Laba was awarded an additional 80,000 options, bringing her total options holdings to 209,738. Between January 1, 2015 and April 25, 2015, Laba exercised a total of 59,012 options—28.14% of her holdings—and immediately sold the shares for total gross proceeds of $1,084,393. To the extent that any of Laba's stock options were not fully vested and exercisable at the same of the sales listed above, these 13.35% and 28.14% percentages of holdings sold would be proportionally higher.

198. Defendants stated publicly, and accordingly knew, no later than January 29, 2014, the effective date of the IPO Registration Statement, that they planned to announce the top-line results of the CUPID 2 study in April 2015. Celladon, or Zsebo herself, repeatedly reminded the market of this April 2015 readout date during the Class Period, including in the 2013 Form 10-K; the associated March 31, 2014 investor conference call; the April 10, 2014 press release announcing Mydicar's Breakthrough Therapy designation; the May 13, 2014 investor conference call; the Jefferies 2014 Global Healthcare Conference on June 5, 2014); the August 7, 2014 investor conference call; the August 12,

2014 Registration Statement for the Secondary Offering; the Best of *Circulation* Research Symposium on November 16, 2014); the 2014 Form 10-K; and the associated March 31, 2015 investor conference call.

199. Because Zsebo and Laba each understood that the statistically flawed CUPID 1 trial formed no basis to believe that CUPID 2 would be successful, and each knew long in advance that the CUPID 2 results would be announced in April 2015, they put themselves in a no-lose position by selling a material portion—but not all—of their Celladon stock. If the CUPID 2 trials were successful, the stock options Zsebo and Laba retained would increase their wealth substantially. At the same time, because they, unlike the investing public, knew of the extent to which that result was a gamble unsupported by empirical evidence, the sale of a material portion of those securities immediately before the results became known, at a time that the share prices had been artificially inflated by their misrepresentations, operated as an insurance policy or hedge against the real risk of failure of CUPID 2 and the fallout that would no doubt ensue. This fallout could include a crash in the share price, loss of their positions with the Company, and potentially the demise of the Company itself, and indeed that is what occurred.

**F. Sarbanes-Oxley Act Certifications**

200. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants Zsebo and Laba each certified in the Company's 2013 Form 10-K, filed with the SEC, that they had reviewed the Annual Report, and had found that it did "not contain any untrue statement of a material fact or omit to state a material fact . . . ." Zsebo and Laba each further certified that Celladon's disclosure controls were designed to, and did, keep them apprised of all material information about the Company. In the Company's 2014 Form 10-K, Defendant Zsebo again executed the SOX certifications, making the same representations that she had made in the SOX certifications accompanying and filed with the 2013 Form 10-K.

### G. Corporate Scienter

201. Celladon acted with "corporate" scienter given that the material misstatements and omissions regarding the validity of the data analysis underlying the reported results of CUPID 1 and the magnitude of the risk that CUPID 2 outcome would not be positive based on the Company's stated CUPID 1 results were approved by corporate officials sufficiently knowledgeable about the Company to know that the statements were false and misleading. At least one authorized agent of the Company authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed or approved the statements in which the misrepresentations were made before their utterance or issuance. Moreover, at least one authorized agent of the Company ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance.

## IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

202. The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

203. None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

204. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

205. Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Celladon who knew that the forward-looking statement was false.

## X. LOSS CAUSATION

206. The market prices of Celladon's publicly traded securities were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1.

207. The artificial inflation in Celladon's securities prices was removed when the concealed risks alleged herein materialized or the conditions and risks misstated and omitted by Defendants were revealed to the market, causing investors' losses. The information was disseminated through several partial disclosures, on April 22, 2015 and April 26, 2015, and fully disseminated on June 26, 2015. These disclosures, more fully described above, revealed the nature and extent of the risk that CUPID 1 results formed no basis to proceed with CUPID 2

in light of the fundamental flaws in CUPID 1. The disclosures reduced the prices of Celladon's publicly traded securities, causing economic injury to Lead Plaintiff and other members of the Class.

208. None of the partial disclosures was sufficient on its own to fully remove the inflation from the prices of Celladon's publicly traded securities, because each only partially revealed the risks and conditions that had been concealed from investors.

209. The corrective impact of the partial disclosures alleged above was tempered by Defendants' continued misstatements and omissions about the design and protocols of CUPID 1, the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the lack of reliable clinical evidence that Mydicar could ever be a viable treatment for heart failure. These continued misrepresentations continued to maintain the prices of Celladon's publicly traded securities at levels that were artificially inflated, inducing members of the Class to continue purchasing Celladon securities even after the concealed risks began to materialize or truth began to partially enter into the market. Further price declines that caused additional injury to the Class occurred upon the further materialization of concealed risks or the disclosure of additional information regarding the design and protocols of CUPID 1, the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the lack of reliable clinical evidence that Mydicar could ever be a viable treatment for heart failure.

210. As a result of all of the corrective disclosures of the truth and the materialization of the risks concealed by Defendants' misrepresentations and omissions, the price of Celladon shares fell by nearly 92%, from $16.36 at close on April 21, 2015 to $1.35 at close on June 26, 2015.

## XI. CONTROLLING PERSON ALLEGATIONS

211. By virtue of the Individual Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about Celladon, the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1. The Individual Defendants ascertained such information through Celladon's internal corporate documents, conversations, and connections with each other and with corporate officers, employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Celladon officers and directors.

212. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein. Because of their Board or executive and managerial positions with Celladon, each of the Individual Defendants had access to the adverse undisclosed information about Celladon's condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Celladon and its business or adopted by the Company materially false and misleading.

213. The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their

issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

214. As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XII. CLASS ACTION ALLEGATIONS

215. Lead Plaintiff brings this action on behalf of himself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock or call options of Celladon, or sold Celladon put options, and were damaged thereby. Excluded from the Class are Defendants; present and former executive officers of Celladon, members of Celladon's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); Celladon's subsidiaries, affiliates, or parent companies, including Celladon's employee retirement and benefit plan(s); any entity in which any

Defendant has or had a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

216. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Celladon common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. As of March 31, 2015, for example, Celladon had 23,827,918 shares of common stock issued and outstanding, owned by thousands of persons. Record owners and other members of the Class may be identified from records maintained by Celladon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

217. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the prices of Celladon publicly traded common stock were artificially inflated due to the misrepresentations and omissions of material fact alleged herein; and

(f) whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

218. Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired Celladon publicly traded securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein.

219. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

220. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

## XIII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

221. Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Celladon common stock traded in efficient markets;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Celladon common stock and other publicly traded securities; and

(e) Lead Plaintiff and other members of the Class purchased common stock and other publicly traded securities between the time Defendants misrepresented or failed to disclose material facts and the time the concealed risks materialized or the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

222. At all relevant times, the markets for Celladon's common stock and other publicly traded securities were efficient for the following reasons, among others:

(a) as a registered issuer, Celladon filed periodic public reports with the SEC;

(b) Celladon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c) Celladon was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d) Celladon's securities were actively traded in efficient markets, including NASDAQ, where the Company's common stock trades under the ticker symbol "CLDN."

223. As a result of the foregoing, the markets for Celladon common stock and other publicly traded securities promptly digested new material information regarding Celladon from all publicly available sources and reflected such information in the price of those securities.

224. Under these circumstances, all purchasers of Celladon publicly traded securities during the Class Period suffered similar injury through their purchase of Celladon securities at artificially inflated prices, and the presumption of reliance applies.

225. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

226. Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market prices for Celladon common stock and other publicly traded securities and to a presumption of reliance on Defendants' material misstatements and omissions during the Class Period.

## XIV. CAUSES OF ACTION

### COUNT I

### Asserted Against Defendant Celladon for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

227. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Celladon.

228. During the Class Period, officers, management, and agents of Celladon carried out a plan, scheme and course of conduct which was intended to

and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the design and protocols of CUPID 1, the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, as alleged herein; (ii) enable Celladon to artificially inflate the price of Celladon securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Celladon securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Celladon took the actions set forth herein.

229. Officers, management, and agents of Celladon directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain Celladon's artificially inflated securities prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

230. Officers, management, and agents of Celladon employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celladon's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make the statements made about the design and protocols of CUPID 1, and the purported positive results of CUPID 1 that formed a basis to predict the results of CUPID 2, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Officers, management, and agents of Celladon did not have a

reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Celladon securities during the Class Period.

231. Celladon is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls and SEC filings.

232. Celladon is further liable for the false and misleading statements made by Celladon's officers, management, and agents in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the maker of such statements and under the principle of respondeat superior.

233. In addition to the duties of full disclosure imposed on Celladon as a result of the affirmative statements and reports made by its officers, management, and agents, or participation in the making of their affirmative statements and reports to the investing public Celladon had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.1-01 et seq.) and S-K (17 C.F.R. §§ 229.10 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities so that the Company's securities prices would be based on truthful, complete and accurate information.

234. The allegations above establish a strong inference that Celladon, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations

and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and misstating the intrinsic value of Celladon securities. By concealing these material facts from investors, Celladon maintained its artificially inflated securities prices throughout the Class Period.

235. In ignorance of the fact that Celladon's securities prices were artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Celladon, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Celladon but not disclosed in public statements by Celladon during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired Celladon securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Celladon securities as the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1 was revealed.

236. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a

reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and intrinsic value of Celladon securities, Lead Plaintiff and other members of the Class would not have purchased or acquired their Celladon securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

237. By virtue of the foregoing, Celladon has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

238. As a direct and proximate result of Celladon's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Celladon securities during the Class Period.

## COUNT II

### Asserted Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

239. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

240. During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, as alleged herein; (ii) enable Celladon to artificially inflate the price of Celladon securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Celladon

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants took the actions set forth herein.

241. The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock and other publicly traded securities in an effort to maintain Celladon's artificially inflated securities prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. The Individual Defendants are each sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Celladon as alleged below.

242. In addition to the duties of full disclosure imposed on the Individual Defendants as a result of their affirmative statements, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.1-01 et seq.) and S-K (17 C.F.R. §§ 229.10 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities so that the Company's share prices would be based on truthful, complete and accurate information.

243. The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal

adverse material information about the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, as specified herein.

244. The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celladon's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make the statements made about the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. The Individual Defendants additionally engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Celladon securities during the Class Period.

245. The Individual Defendants' primary liability, and controlling person liability, also arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Celladon during the Class Period and members of Celladon's management team or had control thereof; (ii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of Celladon's management team, internal reports, and other data and information about the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities at all relevant times; and (iii) each of the

Individual Defendants was aware of Celladon's dissemination of information to the investing public that he or she knew or recklessly disregarded was materially false and misleading.

246. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and without a reasonable basis for the purpose and effect of concealing the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities. By concealing these material facts from investors, the Individual Defendants maintained Celladon's artificially inflated securities prices throughout the Class Period.

247. In ignorance of the fact that market prices of Celladon's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants but not disclosed in public statements by the Individual Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired Celladon securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Celladon securities as the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1 was revealed.

248. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, which were not disclosed by the Individual Defendants, Lead Plaintiff and other members of the Class would not have purchased or acquired their Celladon common stock and other publicly traded securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

249. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

250. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Celladon securities during the Class Period.

## COUNT III

### Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

251. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

252. The Individual Defendants acted as controlling persons of Celladon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights,

participation in and/or awareness of the design and protocols of CUPID 1, and the inability of the purported positive results of CUPID 1 to serve as a reasonable basis to predict the results of CUPID 2 in light of the fundamental flaws in CUPID 1, and the intrinsic value of Celladon securities, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

253. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. As set forth above, Celladon and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Celladon securities during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiff and the members of the Class damages and interest thereon;

C. Awarding Lead Plaintiff's and the Class's reasonable costs, including attorneys' and experts' fees; and

D. Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XVI. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: February 29, 2016

LABATON SUCHAROW LLP

By: *<u>/s/ Joel H. Bernstein</u>*
JOEL H. BERNSTEIN
IRA A. SCHOCHET
ERIC J. BELFI
DAVID J. GOLDSMITH
MATTHEW J. HRUTKAY

ROBBINS GELLER RUDMAN & DOWD LLP
SCOTT H. SAHAM
DARRYL J. ALVARADO

*Attorneys for Lead Plaintiff Wahid Tadros and Co-Lead Counsel for the Class*